**MAYSTEEL PRODUCTS, INC.,**
Petitioner,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 13124.

United States Court of Appeals
Seventh Circuit.

Feb. 27, 1961.

Marvin E. Klitsner, William J. Willis, Milwaukee, Wis. (Foley, Sammond & Lardner, Milwaukee, Wis., of counsel), for petitioner.

Charles K. Rice, Asst. Atty. Gen., Tax Division, Gilbert E. Andrews, Jr., Lee A. Jackson, Harry Baum, Grant W. Wiprud, Attys., Dept. of Justice, Washington, D. C., for respondent.

Hugh Satterlee, Rollin Browne, New York City, Amici Curiae.

Before SCHNACKENBERG, KNOCH and CASTLE, Circuit Judges.

CASTLE, Circuit Judge.

Maysteel Products, Inc., petitioner, prosecutes this appeal from a Tax Court decision ruling that Maysteel was not entitled to a deduction claimed for amortizable bond premium and determining a deficiency in the amount of $9,618.25 in connection with taxpayer's corporate income tax for its fiscal year ending November 30, 1953. In that year taxpayer purchased certain bonds, borrowing the major portion of the purchase price, and shortly thereafter transferred its equity in the bonds to a tax-exempt corporation. The Tax Court held the taxpayer was entitled to a deduction claimed for the charitable contribution but not entitled to a deduction for amortizable bond premium.

The contested issues are:

(1) Whether there was clear error in the Tax Court's finding that the taxpayer's purchase and disposition of the bonds were for a non-business purpose— a charitable donation—and were motivated solely by the purpose of obtaining an additional tax deduction by virtue of the premium paid.

(2) And, if not, does such lack of commercial purpose coupled with the co-existent tax deduction motive preclude application of Sections 23(v) and 125 of the 1939 Internal Revenue Code, 26 U.S. C.A. §§ 23(v), 125?

Pertinent facts established by the record may be summarized as follows:

Taxpayer is a Wisconsin corporation. Prior to 1953 its stockholders organized a separate corporation, Maysteel Foundation, Inc., for the purpose of receiving donations to be disbursed for religious, educational and related purposes. During 1953 the Foundation was exempt from income tax under Section 101(6) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 101(6), and contributions to the Foundation were deductible.

On September 22, 1953, the taxpayer purchased $100,000.00 in principal amount of 3¾ per cent Appalachian Electric Power Company bonds due June 1, 1981. The purchase price of the bonds was 114⅛. The total cost to the taxpayer was $115,843.75, which included $500.00 commission and $1,218.75 accrued interest. The bonds were subject to call for redemption by their issuer on thirty-days' notice at 100 plus a special redemption premium of 2⅜ per cent.

The taxpayer borrowed $100,000.00 of the purchase price of the bonds from a bank, paying the balance from its own funds. It gave its promissory note to the bank in the amount of $100,000.00, dated September 30, 1953, due thirty-five days after date, with interest at 3¾ per cent. The bonds were held as collateral for payment of the loan.

On October 23, 1953, taxpayer recorded on its books an amortization of the premium paid for the bonds in the amount of $12,250.00 (cost plus commission less call price) which it deducted on its income tax return for the fiscal year as part of its general and administrative expenses.

On October 26, 1953, taxpayer made a gift of the bonds to the Foundation, subject to the taxpayer's indebtedness to the bank. The Foundation sold the bonds October 27, 1953 for $119,000.00, plus accrued interest of $1,572.92, less a commission of $500.00, and federal tax of $50.00, for a net amount of $120,022.92. Taxpayer also claimed a deduction for the charitable contribution.

The Commissioner disallowed both the claimed deductions. The Tax Court allowed the charitable deduction but not the deduction for amortization of bond premium.

The entire transaction was proposed to the taxpayer, and carried out on its behalf, by an investment broker who was soliciting business of clients interested in the cumulative tax benefits of an amortization deduction and a charitable contribution. This broker handled the purchase of the bonds, arranged for the bank financing, prepared all of the documents necessary for the taxpayer's execution and handled the final closing of the transaction, including the sale of the bonds and satisfaction of the loan.

From our review of the record we are satisfied that it amply supports the Tax Court's findings that the transaction, and each of the component steps, was designed to effect a charitable gift with the concurrent motive of generating an amortization deduction in addition to the charitable deduction. We turn to the question of whether the character of the transaction here involved and the motive which prompted the form it took preclude taxpayer from the benefits of the deduction for amortizable bond premium.

Section 23 of the Internal Revenue Code of 1939 authorizes a deduction for amortizable bond premium, as provided in Section 125 of the Code. So far as relevant, Section 125, in substance, defines amortizable bond premium as the difference between a bondholder's basis for determining loss on sale or exchange of bonds (generally purchase price) and the amount payable on redemption of the bond at maturity or at the earliest call date. In effect, Section 125 allows the amortization (and deduction) of the entire bond premium within the year of purchase of callable bonds, where the earliest call date falls within such year.

The transaction here involved meets the literal requirements of the provisions authorizing amortization deductions. The Government contends, however, that it lies outside the plain intent of the statute.

The Government relies on cases such as Knetsch v. United States, 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128; Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596; and Gilbert v. Commissioner of Internal Revenue, 2 Cir., 248 F.2d 399, affirmed after remand, 2 Cir., 262 F.2d 512. But those cases involved instances where the transaction relied upon was a mere sham or lacked economic reality. In such situations the courts properly disregard form for substance. While the end result here was a gift—not a business transaction—the bond purchase, loan, note and pledge of collateral, sale of the bonds, and satisfaction of the loan were in every respect genuine financial and commercial transactions. They were real in every sense. And the taxpayer was exposed to all of the usual risks involved in such transactions. It incurred genuine obligations; risks and obligations beyond its control. The transaction here had economic substance, was not a sham nor rigged device without real substance or risk, and inducement or motive is without significance. Taxpayer incurred the risk of loss in event of decline in the market; was entitled to benefit from any advance; it was not bound to make the gift it ultimately did but could have retained the benefits of the transaction. Substantive and economic reality were present.

The motivation involved does not destroy the commercial reality and genuineness of the transaction. It is our conclusion that the Tax Court erred in disallowing the deduction for amortizable bond premium. The decision of the Tax Court is reversed and the proceeding remanded to the Tax Court for further proceedings consistent with the view herein expressed.

Reversed and remanded.

SCHNACKENBERG, Circuit Judge (dissenting).

Even if we had a right to disregard rule 52(a),[1] and were to weigh the evidence heard by the Tax Court, we would still arrive at substantially this finding of fact made by that court:

"The series of transactions * * constituted a single planned transaction entered into by petitioner with no intention that such transactions should produce a business profit, gain or benefit other than that which might result from a deduction for bond premium amortization in accordance with sections 23 and 125 of the Code and a deduction for a contribution of its equity in the Appalachian bonds. * * * "

The language of the Supreme Court in Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, characterizes the real nature of the transactions of petitioner in this case. The court said, 293 U.S. at page 469, 55 S.Ct. at page 267:

" * * * The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted. United States v. Isham, 17 Wall. 496, 506 [21 L.Ed. 728]; Superior Oil Co. v. [State of] Mississippi, 280 U.S. 390, 395–396 [50 S.Ct. 169, 74 L.Ed. 504]; Jones v. Helvering, 63 App.D.C. 204, 71 F. (2d) 214, 217. But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended. * * *

" * * * Putting aside, then, the question of motive in respect of taxation altogether, and fixing the character of the proceeding by what actually occurred, what do we find? Simply an operation having no business or corporate purpose—a mere device which put on the form of a corporate reorganization as a disguise for concealing its real character, and the sole object and accomplishment of which was the consummation of a preconceived plan, * * *. It was brought into exist-

---

1. Fed.Rules Civ.Proc. 28 U.S.C.A., rule 52(a).

ence for no other purpose; it performed, as it was intended from the beginning it should perform, no other function. * * *"

We find pertinent here what the court said, 293 U.S. at page 470, 55 S.Ct. at page 268:

" * * * The rule which excludes from consideration the motive of tax avoidance is not pertinent to the situation, because the transaction upon its face lies outside the plain intent of the statute. To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose."

In Gregory v. Helvering, supra, the court affirmed the Second Circuit, 69 F.2d 809, where it was said, at page 810:

" * * * Therefore, if what was done here, was what was intended by section 112(i) (1) (B), it is of no consequence that it was all an elaborate scheme to get rid of income taxes, as it certainly was. Nevertheless, it does not follow that Congress meant to cover such a transaction, not even though the facts answer the dictionary definitions of each term used in the statutory definition. It is quite true, as the Board has very well said, that as the articulation of a statute increases, the room for interpretation must contract; but the meaning of a sentence may be more than that of the separate words, as a melody is more than the notes, and no degree of particularity can ever obviate recourse to the setting in which all appear, and which all collectively create * *"

To the same effect is Knetsch v. United States, 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128.

· The total cost of the bonds was $115,843.75, and, since petitioner borrowed $100,000 of this amount, it was actually out-of-pocket $15,843.75. Obviously, it did not intend to hold the bonds for any appreciable length of time. Its bank note for $100,000 was dated September 30, 1953 and was due 35 days after date.

Petitioner planned to pay this loan when due, as its own president testified, through the *donee's* sale of the bonds. It was, of course, very unlikely that the bonds would either greatly appreciate or depreciate in value during the short period they were held by petitioner. In any event, any augmentation or diminution of such equity, by reason of fluctuation in the market over the 34 day period between the purchase of the bonds on September 22, 1953 and the gift thereof to the Foundation on October 26, 1953, would simply result in increasing or diminishing the size of the gift. Moreover, during the short period that it actually held the bonds, petitioner would not be any the poorer for the cost of the loan, since the interest rate on the latter ($3\frac{3}{4}$ per cent) was precisely the same as the rate of interest earned by the bonds. Thus, in net effect, petitioner simply invested $15,843.75 with the expectation of making a gift to the Foundation of whatever amount that investment would produce, in the form of its equity in the bonds. Its economic position was altered only to the extent of this net investment, and the investment was made only for the ultimate purpose of making the gift. As matters turned out, the bonds actually appreciated in value to such an extent that the Foundation realized a net amount, on the sale of the bonds, somewhat in excess of petitioner's cash investment. This fact, however, does not alter the situation so far as it affected petitioner's economic position, since its intention at all times was to make the gift to the Foundation.

Tax benefits are available only where the commercial substance of a transaction corresponds to its form.

I would hold, in the case at bar, that petitioner's purchase and ephemeral ownership of bonds had no independent commercial significance but were simply a device to secure an amortization deduction in addition to a charitable contribution deduction. It is my opinion that only the gift of bonds had any real economic significance.

For these reasons, I would affirm.