**Edwin A. GALLUN and Jane W. Gallun, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**A. F. GALLUN & SONS CORPORATION, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**Nos. 13341, 13342.**

United States Court of Appeals
Seventh Circuit.

Dec. 13, 1961.

Richard S. Gibbs and W. J. Roper, Milwaukee, Wis., Burlingame, Gibbs & Roper, Milwaukee, Wis., of counsel, for petitioners.

Lee A. Jackson, Chief, Appellate Section, Gilbert E. Andrews, Jr., Attorney, U. S. Department of Justice, Washington, D. C., Louis F. Oberdorfer, Asst. Atty. Gen., Meyer Rothwacks, Attorney, Department of Justice, Washington, D. C., for respondent.

Before SCHNACKENBERG, KNOCH and KILEY, Circuit Judges.

KNOCH, Circuit Judge.

The petitioners in these consolidated cases seek review of deficiencies determined by the Tax Court of the United States, in the amount of $28,401.44 for the calendar year 1954 for Edwin A. and Jane W. Gallun, and in the amount of $17,382.09 for the fiscal year ending September 30, 1954, for A. F. Gallun & Sons Corporation.

The deficiencies claimed in these cases arise out of disallowances of deductions made by petitioners for "bond premium amortizations." The Tax Court found that the bonds were purchased with intent to use them for charitable contributions.

There are no substantial issues of fact. A. F. Gallun & Sons Corporation, a Wis-

consin corporation, hereinafter called "Gallun Corporation," is in the business of tanning high grade calf leather. During the years 1954, 1955 and 1956, Edwin A. Gallun was president and controlling stockholder of Gallun Corporation. He was also president and treasurer of the Gallun Foundation, Inc., a recognized charitable organization, exempt from federal income tax, contributions to which were deductible for federal income tax purposes.

Late in 1953 or early in January, 1954, Lawrence W. Snell, whose company is a registered dealer in securities, advised Edwin A. Gallun of the possibility under the federal income tax laws of amortizing the premium on the purchase of callable bonds to their earliest call date, and then either (1) selling them to take a capital gain, or (2) donating them to charity to take a charitable deduction. Mr. Gallun, during 1954 and 1955, for himself, or for Gallun Corporation, bought and disposed of various quantities of public utility bonds in accordance with the advice received from Mr. Snell.

With small variations, the procedure was as follows: Mr. Gallun bought bonds from Mr. Snell, paying approximately the amount of the premium, out of his own or Gallun Corporation's funds. The balance, approximately the face amount of the bonds was covered by notes issued to banks by Mr. Gallun or Gallun Corporation, for which the bonds were pledged to the banks as collateral. The bonds and the notes, generally due 45 or 60 days from issuance, bore interest at about the same rate. The bonds were held for periods of from 30 days to several months.

With the exception of two lots of about $50,000 face value each transferred to St. Mark's School and Milwaukee Hospital (both tax exempt institutions) and some Illinois Power Company bonds which were sold by Gallun Corporation in 1955, the bonds were all donated to the Gallun Foundation.

The donee institutions were given the interest and equity of Mr. Gallun and the Gallun Corporation in the various bonds, subject to the notes for which the bonds had been pledged as collateral. The lending banks were notified, and Gallun Foundation executed its own notes to the banks to cover the notes of Mr. Gallun and Gallun Corporation. Mr. Snell then sold the bonds for the Gallun Foundation. The balance after satisfaction of the indebtednesses to the banks, out of the proceeds of the sales, was always a contribution to the Gallun Foundation.

With respect to St. Mark's School and Milwaukee Hospital, Mr. Gallun later donated stock to them to cover losses they sustained when Mr. Snell sold their bonds for them at a loss.

The Tax Court denied the amortizable bond premium deductions on the authority of its prior decision in Maysteel Products, Inc. v. C. I. R., 33 T.C. 1021. After the Tax Court's decision in the instant case, its earlier decision in Maysteel was reversed by this Court, 287 F.2d 429. Maysteel concerned Section 125 of the 1939 Internal Revenue Code. This case deals with its successor provision, Section 171 of the 1954 Code.[1]

1. In Maysteel, Judge Castle, speaking for the majority of the Court, described the provisions as follows: "Section 23 of the Internal Revenue Code of 1939 authorizes a deduction for amortizable bond premium, as provided in Section 125 of the Code. So far as relevant, Section 125, in substance, defines amortizable bond premium as the difference between a bondholder's basis for determining loss on sale or exchange of bonds (generally purchase price) and the amount payable on redemption of the bond at maturity or at the earliest call date. In effect, Section 125 allows the amortization (and deduction) of the entire bond premium within the year of purchase of callable bonds, where the earliest call date falls within such year." 287 F.2d at page 430.

Section 171 of the 1954 Code added this limitation:

"§ 171(b) (1) (B) with reference to the amount payable on maturity or on earlier call date (but in the case of bonds described in subsection (c) (1) (B) issued after January 22, 1951, and acquired after January 22, 1954, only if such earlier call date is a date more than 3 years after the date of such issue) * * *".

The Commissioner argues that the instant case presents a more aggravated factual situation than Maysteel, but states the basic question to be whether taxpayers are entitled to the amortizible bond premium deduction where their purchases and transitory ownership of the bonds are merely steps in what proves to be a single, planned tax avoidance transaction, the substantive net effect of which is a gift to charity. The Commissioner contends that the purchases of bonds here lacked any investment or other commercial purpose.

The bonds did qualify in all respects for a premium amortization under Section 171. The transactions did involve genuine purchases, loans, notes, risk of loss, and, in one case, actual loss. The legislative history outlined in the brief filed on behalf of the Commissioner demonstrates that in correcting "abuses" arising out of these provisions, Congress has clearly avoided giving any retroactive effect to its changes. In similar cases, No. 5787, Fabreeka Products Co. v. C. I. R., No. 5795, Friedman v. C. I. R., and No. 5801, Sherman v. C. I. R., the First Circuit, in its opinion issued October 5, 1961, 294 F.2d 876, 877, stated, with some justice, that:

"* * * [T]here is nothing more conducive to disagreement than the matter of interpreting a statute whose apparent meaning would produce in the particular instance a result distasteful to the court."

and:

"The government's anguish herein is understandably intense because * * * if [the taxpayer] is allowed both deductions, she will show an over-all profit, thereby, in its opinion, demonstrating far too tangibly the blessedness of giving."

The First Circuit nevertheless concluded, as we do, that:

"Whatever their ultimate purpose, the taxpayers made actual 'investments' in the ordinary sense of the word. They purchased the bonds. During the necessary holding period they incurred fully all of the risks of ownership, both that the bonds might decline in value, * * * and the possibilities that during that time they might be called. This latter exposure, however negligible it may have been in fact, was the very matter for which the statute provided the deduction. The subsequent sale or other transfers were not paper proceedings, * * *."

and:

"Granting the government's proposition that these taxpayers found a hole in the dike, we believe it one that calls for the application of the Congressional thumb, not the court's."

to which the First Circuit adds a footnote:

"It may not be irrelevant to note that when Congress did amend the statute by the Technical Amendments Act of 1958, § 13, 72 Stat. 1606, 1610, it made a change in no way corresponding to what the government now proposes."

As this Court held in Maysteel, 287 F.2d 429, at page 431:

"The motivation involved does not destroy the commercial reality and genuineness of the transaction."

The Tax Court's denial of deduction claimed for bond premium amortization is reversed and this case is remanded to the Tax Court with directions to enter a decision for the petitioners.

Reversed and remanded with directions.

SCHNACKENBERG, Circuit Judge (dissenting).

Because the foregoing opinion relies on cited courts of appeals' holdings exclusively, I find no reason for abandoning the views which I expressed, in dissent, in Maysteel Products, Inc. v. Commissioner, 287 F.2d 429, 431. There I set forth the teachings of the United States Supreme Court which prevent us from exalting artifice above reality. For that

reason, I repeat, as applicable here what I said in Maysteel, at 432:

"I would hold, in the case at bar, that petitioner's purchase and ephemeral ownership of bonds had no independent commercial significance but were simply a device to secure an amortization deduction in addition to a charitable contribution deduction. It is my opinion that only the gift of bonds had any real economic significance.

"For these reasons, I would affirm."