*Decision will be entered for the respondent.*

MAX STARR AND DORIS L. STARR, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1104–63. Filed June 29, 1966.

*Robert J. Richards, Jr.,* for the petitioners.
*Albert R. Doyle,* for the respondent.

BRUCE, *Judge:* Respondent determined deficiencies in income tax for the calendar years 1958 and 1959 in the respective amounts of $94,283.02 and $3,556.57. The issues remaining for decision are whether petitioners are entitled to a deduction in 1958 for amortization of bond premium in the amount of $39,375 or, in the alternative, for an amount of $21,093.75 paid in settlement of a claim resulting from a transaction entered into for profit.

### FINDINGS OF FACT

The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Respondent does not admit that the words "purchase" and "sale" or words derived therefrom, as used in the stipulation, represent real transactions.

The petitioners are husband and wife. They reside in Swampscott, Mass. They filed joint Federal income tax returns for the calendar years 1958 and 1959 with the district director of internal revenue at Boston, Mass.

Max Starr, hereinafter sometimes referred to as the petitioner, was, in 1958 and 1959, a certified public accountant and a partner in an accounting firm in Boston.

Keizer & Co., Inc., hereinafter referred to as Keizer, is a Boston broker.

Garvin, Bantel & Co., hereinafter referred to as Garvin, is a New York City partnership which has memberships in the New York Stock Exchange and American Stock Exchange and is engaged in business as a bond dealer and money broker.

William Pollock & Co., Inc., hereinafter referred to as Pollock, is a New York City dealer in bonds.

On April 9, 1958, petitioner ordered through Keizer $9 million face amount U.S. Treasury bonds 2⅜-percent due June 15, 1958.

Keizer sent petitioner a confirmation slip dated "4/9/58," stating:

As your Agent, we have this day BOUGHT for your account:

| Quantity | Description | Price | Amount | Comm. |
|---|---|---|---|---|
| $9,000,000 | U.S. Treasury 2-3/8s due 6/15/58 | 100-27/64 plus int. | 9037968.75 | 1406.25 |

The confirmation shows settlement date as "After 6/2 Before 6/5." This was not consistent with the rules of the New York Stock Exchange which required settlement of transactions within a few days.

Keizer executed the petitioner's order, together with others, in the total face amount of $12,750,000, through Garvin. Keizer sent Garvin a confirmation slip dated April 9, 1958, showing the purchase "As Agent for another." Garvin sent Keizer a confirmation dated April 9, 1958, stating: "As Principal and for our own account we confirm SALE TO YOU." Both these confirmations show settlement date as after June 2, 1958, and before June 5, 1958. The price stated was 100–27/64 plus interest.

Garvin ordered bonds from a dealer to meet Keizer's order. The dealer delivered the required bonds to Marine Midland Trust Co., Garvin's clearing agent. Garvin sold these bonds at cost to Pollock for cash under a "repurchase agreement" which authorized Garvin to repurchase the bonds at the same price on demand and authorized Pollock to return the bonds to Garvin for that price at any time.

Petitioner had a capital loss carryover from prior years to 1958. In ordering the bonds, he was seeking a bond premium amortization tax deduction and also thought he could make a gain on the disposition of the bonds.

In 1958 the New York Stock Exchange required a 5-percent margin on the purchase of U.S. Treasury bonds such as those here involved where the purchase was made through a member firm. Petitioner put up no money for margin and understood that Keizer would arrange for any financing found necessary.

According to articles which later appeared in New York newspapers and which were introduced in evidence as a joint exhibit, the Treasury Department, at the time of the above-described transactions, was preparing to refinance certain Government obligations which were maturing in or about June 1958 in an amount in excess of $9 billion. Among the new securities being offered were bonds at 2⅝-percent interest for a term of 6 years and 8 months maturing February 15, 1965, and certificates at 1¼-percent interest maturing in 11 months. The holders of 2⅜-percent bonds maturing June 15, 1958, had the privilege of exchanging these for the new 2⅝-percent bonds. The Treasury estimated that subscriptions for the 2⅝-percent bonds would amount to approximately $3 billion to $4 billion. The subscription books on this issue closed on June 6 and more than $7 billion was subscribed. The buyers were required to take delivery on June 16 and turn in the maturing bonds or pay cash at that time. In February 1958 the Treasury Department had issued a series of 3½-percent bonds maturing in 1990. The bonds were sold at an offering price of about 100 and during the weeks after they were issued the market price increased to $107\frac{1}{32}$. Speculators who entered the market at that time made large profits. As the June refinancing approached, many speculators prepared to enter the market in the hope that a rising market would enable them to make further profits on Government bonds.

The market for bonds declined. The 2⅝-percent bonds were at $100\frac{13}{32}$ on June 5, declined to $100\frac{2}{32}$ on June 17, to $99\frac{22}{32}$ on June 19, and dropped to $93\frac{28}{32}$ on August 29, 1958. Speculators took substantial losses.

Under date of May 12, 1958, Garvin wrote Keizer:

You have purchased U.S. Treasury bonds from us for payment on or about June 2, 1958.

The offering of the new securities is expected about May 29. May 30 is a holiday but the books will probably be open for those who wish to make an exchange on June 2, 3, and 4. The exchange is very sizeable—in excess of $9,000,000,000—and there are many details involved in this type transaction. We are writing this letter with the expectation of receiving your cooperation in expediting the handling of your bonds to your most favorable advantage.

Inasmuch as the subscription period will be limited (to possibly just one day) if your bonds are not exchange [sic] or sold during that period, the Treasury will then redeem your bonds at a price of 100 on June 15, 1958. During the subscription period, the price of your bonds should compare with the highest priced "When-Issued" securities.

In order to take possession of the bonds for purposes of amortization, it will be necessary to finance the securities until delivery date of June 16, 1958. (Note: The maturity date of June 15 falls on a Sunday)

Those who intend to carry the new bonds beyond that date will require a bank loan and will be called on to provide additional funds for this purpose.

We have enclosed a letter of authorization which we ask that you date, sign, and return to us immediately in the envelope provided herewith. We cannot

stress too strongly that for your own financial advantage, your immediate co-operation is of the utmost importance.

## Under date of May 26, 1958, Keizer wrote Garvin:

Please apply the following purchase of U.S. Treas. 2⅜%—6–15–58 to the account of Max Starr.

Date | Amount
4–9–58 | 9,000M—Part of 12,750M

Please give us the numbers of these bonds or let us know by whom they are held.

## Under date of June 2, 1958, petitioner wrote Keizer:

Please exchange for my account 9,000M U.S. Treas. 2⅜%—6–15–58 for the new issue offered, which Garvin, Bantel & Co. considers the most advantageous.

Kindly have Garvin, Bantel & Co. arrange financing of the new securities for an indefinite period through June 16, 1958.

## On the same date Keizer wrote Garvin:

Please exchange for our account, or the account of the following, U.S. Treasury 2⅜s of 6/15/58, for the new issue offered, which you consider most advantageous,

```
 6,000M a/c Morris Borkum
10,925M a/c Leo A. Wexler
20,000M a/c Wexler Construction Co., Inc.
 7,000M a/c J. Benn Keizer
 9,000M a/c Max Starr
 5,000M a/c Sumner R. Kates
 5,000M a/c Marshall S. Kates
```
_____

62,925M Total

Kindly arrange financing of the new securities for an indefinite period through June 16, 1958.

## On the same date Keizer wrote petitioner:

In accordance with your instructions, we have tendered for your account $9,000,000 U.S. Treasury 2⅜% 6/15/58 for $9,000,000 U.S. Treasury 2⅝% due 2/15/65.

Please be further advised that the following figures apply for delivery 6/16/58:

| | |
|---|---:|
| Price—100²⁷⁄₆₄+¹⁄₆₄ _____ | $9,039,375.00 |
| Accrued interest to 6/1/58_____ | 99,241.10 |
| Total Cost_____ | $9,138,616.10 |
| Interest on loan 6/2–6/15/58_____ | 7,633.90 |
| Total _____ | $9,146,250.00 |
| Less 6/15/58 coupon_____ | 106,875.00 |
| Balance due_____ | $9,039,375.00 |
| Payment received_____ | _____ |
| Due on delivery_____ | $9,039,375.00 |
| | plus interest |

We ask that you kindly retain this letter as confirmation of your transaction.

Pollock exchanged the 2⅜-percent bonds on maturity for the 2⅝-percent bonds of the new issue. Pollock collected the interest for the period it held the bonds.

Garvin dealt with Keizer, not with petitioner.

Under date of June 26, 1958, Garvin wrote Keizer:

Upon receipt of approximately $200,000.00 needed to mark down to market U.S. Treasury 2⅝% 1965, we shall confirm to the following customers of Keizer & Co., Inc., our sale to them of the U.S. Treasury 2⅝% 1965 bonds in the face amount set opposite their names, and simultaneously we will notify Keizer & Co., Inc. that their contracts of purchase from us of said bonds have been cancelled:

| * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|

Max Starr_____ $9,000,000

Under date of June 27, 1958, Garvin wrote Keizer:

I brought a copy of our last night's letter to your company to the Exchange today. They absolutely refused to allow us to make any changes of any confirmations. They are adamant that the entire transaction must stand as it was originally contracted for. The position, then, continues to stand in the name of Keizer & Co., Inc.

Further, they have asked us to immediately remove all nonmember repurchase agreements from our books. We must, therefore, plan on immediate delivery of your bonds. They will allow us no extenstion [sic] of time.

If we can be of service in arranging bank loans for you, we will be glad to offer you the most attractive terms available.

On July 3, 1958, Garvin sent to petitioner the following telegram:

The following message was wired July 2 to Keizer & Co. covering the U.S. Treasury 2⅝% 1965 purchased by us for your account in accordance with instructions received from Keizer & Co. "If we have not received instructions from you as per our wire of July 1 by 3:00 P.M. NY time, July 3, 1958, we shall sell for your account at the best available market the U.S. Treasury 2⅝% 1965 and shall hold you responsible for the balance due. Signed Garvin, Bantel & Co."

Garvin's records show charges to Keizer's account between April 2 and May 13, 1958, for orders amounting to $62,925,000 in U.S. Treasury 2⅜ due 1958. The only credit shown in this period is for cash $8,125. Further credits for cash received are shown under dates of June 18 for $29,375, June 19 for $86,250, June 26 for $40,000, and June 27 for $200,000. Credits for U.S. Treasury 2⅝, 1965, sold or delivered are shown between June 25 and July 10. The account as of July 10 showed charges of $63,285,418.85, credits of $63,070,520.41, and balance due Garvin of $214,898.44. Garvin sold all these bonds to various banks or corporations under repurchase agreements, and the bonds were delivered to them. The bank or corporation would mark the bonds to market at intervals and Garvin would make payments accordingly.

Keizer did not give Garvin instructions as to sale of the bonds, and Garvin between June 26 and July 10 sold them at the market, which had declined, and charged Keizer with the loss. Later Garvin sued Keizer and its customers, including petitioner, in the U.S. District Court for the District of Massachusetts. The case was settled by agreement of the parties. Garvin gave a release to petitioner, and petitioner gave a release to Garvin. In connection with the settlement, petitioner gave a check to Keizer dated November 28, 1958, in the amount of $21,093.75 and received a general release from Keizer.

Charges were presented to the board of governors of the New York Stock Exchange in September 1958 against the partners of Garvin for violation of certain rules of the Exchange. In these charges the method of handling transactions such as are involved in this case was described as follows:

The regular business of Garvin, Bantel & Co. for some time has included acting as money brokers in the arrangement of loans between banks and individuals. Customers' collateral loans are also arranged on behalf of other member firms. As compensation, Garvin, Bantel & Co. receives a portion of the interest earned by the lending banks on the loans arranged by the firm.

Another form of financing which was arranged by Garvin, Bantel & Co. starting early this year, primarily in connection with U.S. Treasury issues, involved the use of repurchase agreements. This arrangement enabled customers of Garvin, Bantel & Co. to carry positions in U.S. Treasury issues for varying periods without providing the margin which would normally be required for such a commitment. As originally contemplated, the purpose of the plan was to afford customers an opportunity to obtain certain tax benefits. However, as it later developed, it appears that possible trading profits were also a collateral, if not the sole consideration, in some cases.

The tax benefit aspect related to 2⅜%, 2¾% and 2⅞%, issues which matured on June 15, 1958. Owners of these bonds had the right to exchange them for 2⅝% refunding bonds which were issued on June 16, 1958. Because of this exchange or "roll-over" privilege, which was the only certain way the new 2⅝% bonds could be obtained on initial issuance, the maturing issues sold at a premium above par. A purchaser buying the bonds and paying this premium could, under the tax law, deduct the amount of the premium from his general income and this was of tax advantage to people in higher tax brackets.

The details of the operation and the part Garvin, Bantel & Co. played in it can best be explained by citing a hypothetical but typical example.

A customer wishing to buy say $1,000,000 principal amount of the 2⅜% bonds, to be "rolled over" into the 2⅝% bonds, approached or was sought out by Garvin, Bantel & Co. This purchase and the subsequent temporary financing of the resulting position were accomplished through a series of simultaneous transactions by Garvin, Bantel & Co. The firm bought the bonds for its own account at perhaps 100½ from a professional Government bond dealer and sold them to a bank, corporation or other institutional buyer at the identical price, with both transactions made for next day delivery. Concurrent with the sale, Garvin, Bantel & Co. entered into a repurchase agreement with the institutional buyer whereby the firm agreed to repurchase the bonds at the same price on demand or on demand after a specified date. As an offset to this contractual commitment, Garvin, Bantel & Co. sold the bonds on the same delivery terms, usually at a

⅟₃₂ mark-up, to the customer who likewise had the right to demand delivery of the bonds at any time after the date specified. On the contract date the customer became the beneficial owner of the bonds. He was the beneficiary of any subsequent price appreciation and had to bear any loss due to price decline. In no instance was margin, as such, asked for or obtained. In consideration of the interim financing the customer paid interest, usually at the bond coupon rate, to Garvin, Bantel & Co., and the firm in turn passed it along to the institutional buyer.

Upon ultimate delivery of the bonds the customer could either sell them or arrange other financing of his position. Garvin, Bantel & Co. very often arranged such financing as part of its regular business.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

As the result of repurchase agreements entered into by Garvin, Bantel & Co. beginning earlier this year, the firm was committed in the middle of June 1958, to buy back approximately $500,000,000 principal amount of U.S. Treasury Bonds, at which time the firm's capital was at best $800,000. Although the firm considered this position to be offset by reason of the sale to customers of a like amount of bonds, nevertheless the effectiveness of such offset was dependent entirely on the financial ability of the customers. Garvin, Bantel & Co.'s only protection in the event of a price decline in the bonds was the right to call on the customer to mark to the market.

On September 15, 1958, Garvin, in responding to the charges, explained the nature of the transactions as follows:

While we do perform the ordinary functions of a Member firm, that is, the purchase and sale of securities, we are essentially brokers for brokers and have never actively solicited the accounts of individuals. Our primary business is and has been, since our inception 27 years ago, that of a "money-broker" servicing banks, brokers, and dealers in financing and the placing of loans at rates advantageous to brokers and their customers. In this department we have presently on our books some 700 million dollars in loans for these brokers and their customers.

Neither is ours the ordinary money brokers' business. We occupy a role unique in the country's financial system. It is the function of our Federal Funds Department to operate and maintain an equitable and orderly market in these Funds—a function upon which all of the nation's major banks are either directly or indirectly dependent.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

In this department our daily volume runs from 500 million dollars to nearly 1 billion dollars. Such amounts are routine in its daily operation. This is an irreplaceable service and brings our name, and consequently that of the New York Stock Exchange, before the most prominent bankers in the country each day. As a result of our operations we have developed into an integral part of the nation's banking system.

It is in this department that we deal extensively in "repurchases." Repurchases are a normal, accepted, recognized means of financing government securities. When we entered into the operation under discussion, it was not a departure from our ordinary routine to operate through repurchases.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

It was, therefore, evident that our office was accustomed to large dollar volume and the use of the repurchase technique. With this experience we entered into the financing of the government securities in the Spring of 1958. In retrospect, it appears that our judgment as to the size of our undertaking was erroneous,

and that our firm was inadequately staffed and prepared for the work we undertook.

But we consider it essential for you to understand the details of our first transaction. The idea was first presented to our Senior partner in an inquiry by a member firm who wished to arrange for the purchase and financing of a sizeable amount of U.S. Treasury bonds maturing June 15, 1958. They had approached their own banks who were not able to provide the necessary funds at the required rate. Although we were able to quote an improved rate, we were advised that the transaction would only be feasible if the bonds could be carried without loss of interest.

We sensed that this loan was, as are many of the loans handled by our firm, for tax purposes and upon investigation found this to be so. We were advised that their client, a substantial individual in a high-income tax bracket, wished to buy bonds at an approximate premium of $90,000.00. Since, under the tax law, the premium is deductible from ordinary income, and their client was in a tax bracket exceeding 70%, there was a saving in taxes to the client of more than $63,000.00

On the roll-over he would sell the new bonds at the same price, and the $90,000.00 premium would provide a short-term profit against an offsetting loss which would be tax free. Rate here was the prime factor as any charge above the coupon would reduce the tax advantage.

Just at that time several prominent corporations had completed new financing and were heavy in short-term investments, namely Treasury Bills. Since these Bills were hovering below a 1% yield, any improvement was keenly sought. We were eventually able to arrange with a corporation to purchase bonds which we in turn repurchased for future delivery on demand at the same price. This afforded the corporation nearly a 300% increase in income.

Although it required a large volume to obtain an appreciable write-off, the transaction seemed riskless and provided the investor with the sought-after tax relief. It was indeed a gift for the wealthy who either had, or could create, short-term losses.

There are no secrets in Wall Street—and the idea spread like wildfire. We were almost immediately deluged with requests for comparable financing and it was our honest assumption that tax relief was their only concern. We feel we should not be held accountable for those firms who blindly followed, without investigation. Looking back, while we refused many, many millions, it appears that we might have been over-zealous in our efforts to provide a money-brokerage service to the financial community.

*   *   *   *   *   *   *

Our commitments for the sale of these bonds were back to back with off-setting repurchase commitments for the identical bonds at the same price—the only difference being a small differential for a trading profit.

We had been assured in every instance of the client's ability and willingness to take possession of the bonds on June 16. When instructions failed to come from these persons, we immediately moved to correct this situation.

The partners of Garvin were censured and fined by the New York Stock Exchange for violations of its rules in these transactions.

On the petitioners' joint return for 1958 they claimed a capital loss carryover from preceding years in the amount of $35,498. They reported a short-term capital gain of $18,281 on the transaction in Treasury bonds, and claimed a deduction of $39,375 for amortization of bonds.

In the deficiency notice dated December 17, 1962, respondent determined that the deduction claimed for amortization of bond premium was not allowable.

## OPINION

Respondent concedes that the Treasury bonds involved were amortizable in accordance with section 171 of the Internal Revenue Code of 1954. Under the related regulations, sec. 1.171–1(a), Income Tax Regs., amortization may be claimed by "the owner of the bond." Respondent contends that the petitioner did not in fact acquire ownership of the bonds so as to allow him to claim the deduction for amortization of bond premium.

Petitioner on April 9, 1958, placed an order with his broker, Keizer, for $9 million face value of 2⅜ Treasury bonds due June 15, 1958. Keizer confirmed the order and placed its own order with Garvin to cover the orders of petitioner and others. The settlement date stated in the confirmation was after June 2, which was not customary, as New York Stock Exchange rules ordinarily required settlement within a few days. Petitioner was not called upon to put up margin, although the Exchange rules required a 5 percent margin on Treasury bond purchases which would have necessitated his providing $450,000 for this purpose. Petitioner paid nothing and made no request at that time for a loan to finance the purchase. When the settlement date arrived, he requested Keizer to exchange the bonds for the new 2⅝ issue and asked Keizer to arrange financing until June 16. He signed no note or other evidence of indebtedness for the purchase, never asked for delivery of the bonds, and plainly never intended to pay for them. His intention was to order the bonds sold and to settle his liability from the proceeds, which he hoped would be more than the liability but which turned out to be less because the market declined.

The actual bonds ordered by Garvin in response to Keizer's order were delivered to Garvin's clearing agent, against payment. Garvin sold these identical bonds to Pollock for cash and the bonds were delivered to and held by Pollock, which company collected the interest and exchanged the maturing bonds for those of the new issue. Pollock had possession of the bonds; petitioner never saw them. Garvin had a "repurchase" contract with Pollock whereby Garvin could, on demand, receive the bonds by repaying the sale price to Pollock or Pollock could, at its election, return them for the same price. This would permit Garvin to fill Keizer's order if petitioner produced the cash and, through Keizer, demanded delivery of the bonds. This arrangement enabled Garvin to allow Keizer and Keizer's customers, including petitioner, to carry their positions without providing the margin required by the rules of the New York Stock Exchange. Garvin was later charged with violation of the rules of the Exchange on this account.

Petitioner contends that he actually purchased $9 million face amount of U.S. Treasury 2⅜ bonds in April 1958, that the purchase was with economic substance, and that he had a sufficient interest in the bonds to support a deduction for bond premium amortization on his income tax return for 1958. He argues that he was owner of the bonds because he was subject to the risks of the market by reason of his contract to pay upon delivery. He had no intention to take delivery. He makes no contention that he was in a position financially to pay the $9 million. He was speculating on the fluctuation of the bond market. If called upon to accept delivery, his only course was to have the bonds sold, or to pay a price for financing a loan to carry his position longer. The purpose of bond premium amortization is to allow recovery of the taxpayer's investment made in the form of premium. *Hanover Bank* v. *Commissioner*, 369 U.S. 672 (1962); *Industrial Research Products, Inc.*, 40 T.C. 578 (1963). Petitioner made no such investment. He invested nothing, yet contends that he was owner of $9 million face amount of Treasury bonds. Petitioner had nothing more than a contract right to have the bonds delivered on payment. He never called for such delivery. The bonds were owned by Pollock. Petitioner was not "the owner of the bonds" within the meaning of the regulations and was not entitled to claim the deduction for amortization.

Petitioner contends, in the alternative, that if the deduction for amortization of bond premium is not allowed, he is entitled to a deduction of $21,093.75 as a loss incurred in a transaction entered into for profit. This is the amount he was required to pay to Keizer in settlement of the claim of Keizer against him resulting from his order for the bonds and the loss resulting when the market price fell. Keizer, in reliance upon petitioner's order, placed an order with Garvin for the bonds. Garvin allowed Keizer to defer settlement until June 2. Keizer then asked Garvin to arrange financing until June 16. When June 16 arrived, Keizer failed to order Garvin to sell. The market had then declined below the price which Keizer and petitioner had agreed to pay. The market continued to decline. Garvin had sold the bonds to Pollock for cost under an agreement whereby either party could reverse the transaction. Garvin, to protect itself against further loss, sold the bonds at a loss and sued Keizer and its customers.[1] The

---

[1] The necessity of this sale, when the bonds had already been sold to Pollock, is not explained.

The testimony of a representative of Garvin indicates that Garvin expected instructions from Keizer "regarding a delivery of the bonds which we had to get to complete the buy back," and that when instructions were not received "We sold the government bonds out," on July 8, 9, and 10, and credited Keizer's account, leaving a balance of $214,898.44 due Garvin.

As the market declined, Garvin had been required to pay Pollock the difference between cost and market. We infer that since Pollock could return the bonds to Garvin for cost, Garvin, when the market fell below that cost, found it necessary to accept them and to resell at the market to protect against a further decline in price.

defendants, including petitioner, recognized that their purchase orders resulted in liability to make good the loss when the market fell and settled the claims. Petitioner paid $21,093.75 to compromise a claim for a substantially larger amount which was his share of Garvin's claim against Keizer.

Respondent contends that the loss is not allowable as a deduction since the transaction was not entered into for profit but primarily to secure income tax benefits, and was a sham and without substance. Respondent cites *Carl Shapiro*, 40 T.C. 34 (1963), and *Lewis* v. *Commissioner*, 328 F. 2d 634 (C.A. 7, 1964), affirming a Memorandum Opinion of this Court.

The cited cases involved deductions claimed for expenses arising out of financial transactions which were held to be carried out solely for tax-avoidance purposes, situations in which the only possible benefit to the participant was the creation of a tax deduction. The conclusions reached were that transactions for the avoidance of taxes do not qualify as transactions entered into for profit and that expenses incurred in carrying out such transactions are not deductible.

These cases are not applicable here. The evidence shows that speculation in Treasury bonds was widespread in the period here involved. Speculators had reaped large profits from fluctuations of the bond market earlier in 1958 and made substantial subscriptions for Treasury bonds when the new issue was offered in June 1958. The speculators looked for a rising market such as had developed earlier in the year and suffered severe losses when the market actually went down. Petitioner was a speculator. Although he did not own the bonds contracted for, he was assuming the risks of the market by his contract to purchase. When the market turned down, the speculators who bought in the hope of a rise found it necessary to sell or close out their contracts and take the loss. Petitioner was one of many who played and lost. He paid $21,093.75 for having guessed wrong. This was a transaction entered into for profit. The fact that he had, also, a motive for securing a deduction for amortization of bond premium does not justify a denial of the loss deduction. Respondent in 1962 accepted the decisions of the courts of appeals allowing such deductions.[2] Rev. Rul. 62–127, 1962–2 C.B. 84. Securing such a deduction was a valid means of reducing taxes. The transaction was not a sham, as respondent contends.

*Decision will be entered under Rule 50.*

---

[2] *Maysteel Products, Inc.* v. *Commissioner*, 287 F. 2d 429 (C.A. 7, 1961), reversing 33 T.C. 1021 (1960) ; *Fabreeka Products Company* v. *Commissioner*, 294 F. 2d 876 (C.A. 1, 1961), vacating and remanding 34 T.C. 290, *Jack L. Sherman*, 34 T.C. 303, and *Sadie S. Friedman*, 34 T.C. 456 ; *Evans* v. *Dudley*, 295 F. 2d 713 (C.A. 3, 1961) ; and *Humphreys* v. *Commissioner*, 301 F. 2d 33 (C.A. 6, 1962), reversing a Memorandum Opinion of this Court.