INDUSTRIAL RESEARCH PRODUCTS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

HUGH S. KNOWLES AND JOSEPHINE KNOTTS KNOWLES, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 81970, 81976. Filed June 24, 1963.

*John S. Pennell* and *Warren C. Seieroe*, for the petitioners.
*Charles B. Wolfe, Jr.*, for the respondent.

MULRONEY, *Judge:* The respondent determined deficiencies in these consolidated cases, as follows:

| Docket No. | Petitioner | Taxable year ended | Deficiency | Addition to tax Sec. 294(d)(2), I.R.C. 1939 |
|---|---|---|---|---|
| 81970 | Industrial Research Products, Inc. | Sept. 30, 1954 | $55,623.48 | |
| 81976 | Hugh S. Knowles and Josephine Knotts Knowles. | 1954 | 32,160.82 | $1,437.87 |

The questions to be decided are the correctness of the deductions taken by petitioners in both dockets for bond premium amortization under section 125 of the 1939 Code and section 171 of the 1954 Code and whether petitioners in docket No. 81976 are entitled to a claimed business expense deduction.

FINDINGS OF FACT

Some of the facts were stipulated and they are found accordingly.

Industrial Research Products, Inc., hereinafter referred to as Industrial, was incorporated under the laws of the State of Delaware on October 21, 1946. Its principal place of business is in Franklin Park, Ill. At all times material hereto, Industrial kept its books and filed its income tax returns on the accrual method of accounting. Industrial filed its Federal income tax return for the year here involved with the district director of internal revenue at Chicago, Ill.

Hugh S. and Josephine Knotts Knowles are husband and wife. During the year 1954 they resided in Glen Ellyn, Ill. They filed a joint Federal income tax return for the year 1954 with the district director of internal revenue at Chicago, Ill.

Livingstone & Co., hereinafter referred to as Livingstone, is a dealer in bonds. It is a sole proprietorship with M. Eli Livingstone the sole proprietor. During the year 1954, Maurice Fine was employed by Livingstone as a salesman. Samuel Livingstone, who is a brother of M. Eli Livingstone, was employed by Livingstone as house counsel. He also did some accounting work for the company. Harry N. Cushing is an attorney, who was acquainted with M. Eli Livingstone in 1954.

Sonics Research Foundation, hereinafter referred to as Sonics, at all times material hereto was a not-for-profit corporation and an organization described in sections 170(c) and 501(c)(3) of the Internal Revenue Code of 1954, contributions to which are deductible under section 170 of the Internal Revenue Code of 1954.

Hugh S. Knowles, hereinafter sometimes referred to as Knowles, is president of Sonics and in 1954 he was president and a director of Industrial. After June 30, 1954, Knowles and his wife owned all the stock of Industrial.

Hartford Electric Light Co. authorized a series of 3¼-percent debenture bonds dated September 1, 1941, maturing on September 1, 1971, which were issued in September 1941. Interest on such bonds was fully taxable and payable on March 1 and September 1. Such bonds were callable for the sinking fund at 100 on any interest date after September 1, 1946. Such bonds are hereinafter referred to as Hartford Electric bonds.

Illinois Power Co. authorized a series of 3⅛-percent bonds dated February 1, 1948, maturing on February 1, 1978, which were issued on February 18, 1948. Interest on such bonds was fully taxable and payable on February 1 and August 1. Such bonds were callable as a whole or in part by lot on not less than 30 nor more than 60 days' published notice at 100.43 to February 1, 1955, for sinking fund, property fund, or maintenance and renewal fund or from certain

moneys in the trust estate. Such bonds are hereinafter referred to as Illinois Power bonds.

Appalachian Electric Power Co. authorized a series of 3⅛-percent bonds dated December 1, 1947, maturing on December 1, 1977, which were issued on December 4, 1947. Interest on such bonds was fully taxable and payable on June 1 and December 1. Such bonds were callable as a whole or in part on not less than 30 nor more than 90 days' published notice at 100½ to November 30, 1957, from maintenance and improvement funds or with proceeds of released property. Such bonds are hereinafter referred to as Appalachian Electric bonds.

In the transactions hereinafter related the Connecticut Bank and Trust Co. of Hartford will be referred to as Connecticut; the Chase National Bank of New York will be referred to as Chase; the Continental Illinois Bank and Trust Co. of Chicago as Continental; the Philadelphia National Bank as Philadelphia; Bankers Trust Co. of New York as Bankers; and Garvin, Bantel & Co. as Garvin.

On July 30, 1954, Livingstone sold $523,300 face value Hartford Electric bonds to Industrial at 108½ or a principal amount of $567,780.50, plus accrued interest of $7,275.34, making a total price of $575,055.84. By letter dated July 30, 1954, Livingstone advised Industrial that it was accepting Industrial's note to Cushing in the amount of $523,300 as payment of that amount which left a cash payment due from Industrial in the amount of $51,755.84 with respect to its purchase of Hartford Electric bonds. Industrial executed a promissory note payable to Cushing in the amount of $523,300, which was dated August 3, 1954, and delivered to and accepted by Livingstone. On August 5, 1954, Industrial paid Livingstone $51,755.84 with respect to its purchase of the $523,300 face value Hartford Electric bonds.

In connection with the purchase of the Hartford bonds, Livingstone notified Industrial by letter dated July 30, 1954, which read, in part, as follows:

I hereby bid you firm good through October 15, 1954, 107¼ for—
    $523,300 Hartford Electric Light Co. 3¼s, due 1971
    In the event of a market decline, I will indemnify you for any losses you may sustain due to bonds being called for redemption or market decline.

Livingstone also notified Industrial by another letter dated July 30, 1954, relating to Industrial's purchase of these bonds which read, in part, as follows:

Gentlemen:
    In connection with your purchase of $523,300 Hartford Electric Light 3¼s, 1971, in the event that any or all of these bonds are called for redemption, I will redeem them at the price at which I have given you your "put" irrespective and notwithstanding such call.

Livingstone notified Industrial by letter dated October 13, 1954, which read, in part, as follows:

We are extending your PUT on $523,300 Hartford Electric Light Co. 3¼ of 1971 through October 20, 1954.

By letters dated August 5, 1954, Industrial (a) instructed Livingstone to deliver $523,300 Hartford Electric bonds to Cushing against payment of $523,300, and (b) instructed Cushing to receive the Hartford Electric bonds from Livingstone against payment to them of $523,300.

By letter dated August 4, 1954, Cushing instructed Livingstone to deliver the Hartford Electric bonds to Chase for Connecticut and receive from Chase $501,000, and on the same date Cushing instructed Connecticut to instruct Chase to receive from Livingstone the Hartford Electric bonds against payment to them of $501,000. Cushing executed his note payable to Connecticut in the amount of $501,000 which was dated August 13, 1954. All of the foregoing instructions were carried out and on August 13, 1954, Chase received custody of $523,300 face value Hartford Electric bonds as collateral security for the loan of $501,000 made that day by Connecticut to Cushing.

On September 3, 1954, Connecticut advised Cushing that pledged Hartford Electric bonds in the face amount of $16,500 had been called for payment and that his note had been reduced in the amount of $16,495.63, being the net amount after payment of shipping charges in the amount of $4.37. On October 4, 1954, Connecticut advised Cushing that pledged Hartford Electric bonds with a face value of $3,000 were called on September 1, 1954, and that it had reduced his note by $2,998.82, representing the proceeds after deducting shipping charges of $1.18. By letter dated September 10, 1954, Cushing advised Industrial that pledged Hartford Electric bonds with a face value of $19,500 had been called and that the proceeds of $19,500 had been applied to reduce Industrial's loan, leaving a balance of $503,800. Industrial received no payment from Livingstone with respect to the $19,500 face value Hartford Electric bonds which were called for redemption.

By letter dated September 8, 1954, Connecticut advised Cushing that coupons having a value of $8,503.62 had been cut from the pledged Hartford Electric bonds and that amount credited as a principal payment on his note. Livingstone sent Industrial a statement dated October 26, 1954, showing the receipt of $8,503.62 with respect to coupons cut from the $523,300 face value Hartford Electric bonds which, after offsetting the interest due on Industrial's note to Cushing through October 21, 1954, in the amount of $3,685.69, left a balance due Industrial of $4,817.93. Livingstone paid Industrial $4,817.93 by check dated October 26, 1954.

At a meeting held on September 30, 1954, Industrial's board of directors declared a dividend in kind consisting of $503,800 face value Hartford Electric bonds subject to a lien in the approximate amount of $503,800, such dividend to be paid on October 15, 1954, to shareholders of record at the close of business on September 30, 1954. On October 15, 1954, Industrial assigned all its right, title, and interest in $503,800 Hartford Electric bonds to Hugh S. Knowles and J. K. Knowles, as tenants in common, subject to the lien held by Cushing in the approximate amount of $503,800. On October 15, 1954, Industrial advised Cushing of its assignment of the $503,800 Hartford Electric bonds.

On October 18, 1954, Knowles sold $503,800 Hartford Electric bonds to Livingstone at 108½ or a total principal amount of $546,623, plus accrued interest of $2,274.10, which, after deducting tax in the amount of $251.90, left a net amount due Knowles of $548,645.20. On or about October 26, 1954, Livingstone paid $45,097.10 to Knowles representing the difference between the net amount due Knowles from their sale of $503,800 Hartford Electric bonds (without taking into account the $251.90 tax) and the lien of $503,800 attributable to such bonds.

Knowles reported the receipt of a dividend in kind on their 1954 Federal income tax return based upon their selling price of the $503,800 face value Hartford Electric bonds less the lien attributable thereto with appropriate adjustments for interest accrued and paid.

Cushing acted solely as an accommodation party for Livingstone in accepting Industrial's note for $523,300; in borrowing $501,000 from Connecticut; and in executing the various instructions concerning the Hartford Electric bonds. He received no money and paid no money in connection with any of the transactions. He did not claim any deduction for amortization of bond premium with respect to the $523,300 face value Hartford Electric bonds pledged as collateral for his $501,000 loan from Connecticut. Cushing did not sell or purport to sell the $523,300 Hartford Electric bonds to any person during the period they were pledged with Connecticut.

On or prior to August 26, 1954, Livingstone had obtained an oral commitment from Connecticut to loan $544,500 on the security of $550,000 face value Illinois Power bonds. The commitment was obtained and the loan arranged by Garvin who acted as a note broker for Livingstone. On August 26, 1954, Livingstone, through its nominee, Fine, sold $550,000 face value Illinois Power bonds to Industrial at a price of 109½ or a principal amount of $602,250, plus accrued interest of $1,766.49, making a total price of $604,016.49. The bonds were sold to be subject to a lien in favor of Connecticut in the amount of $544,500, which left a net amount due from Industrial of $59,516.49.

By letter dated September 7, 1954, Fine advised Industrial the loan had been obtained from Connecticut against the Illinois Power bonds and that notice of his assignment to Industrial would be given to Connecticut. By separate letters on September 8, 1954, Fine advised Connecticut that he had assigned to Industrial all of his right, title, and interest in the $550,000 face value Illinois Power bonds. Both letters were returned by Connecticut to Fine marked "not accepted" and Fine thereafter, on October 5, 1954, instructed Connecticut to disregard such letters.

On September 8, 1954, Connecticut loaned $544,500 to Livingstone's nominee, Fine, on Fine's 90-day note and received custody of the $550,000 face value Illinois Power bonds as security for the loan. The proceeds of the loan were paid for Livingstone's account and credited against the gross purchase price due from Industrial leaving a net amount due of $59,516.49. Connecticut had continuous possession (through its correspondent, Chase) of the entire $550,000 face value Illinois Power bonds from September 9, 1954, until October 22, 1954. On September 10, 1954, Industrial paid Livingstone the net purchase price (i.e., in excess of the Connecticut lien) for the Illinois Power bonds by wire transfer of $59,516.49.

In connection with Livingstone's sale of $550,000 face value Illinois Power bonds to Industrial, Fine acted solely as a nominee for Livingstone in order to facilitate the necessary borrowing. During the period of Industrial's ownership of such bonds, Fine did not claim deductions for amortization of bond premium; did not report interest expense; and did not sell nor purport to sell such bonds to any other person or entity.

In connection with this bond transaction, Livingstone addressed and delivered a letter to Industrial dated August 26, 1954, which read, in part, as follows:

I hereby bid you firm good through November 15, 1954, 108½ for—
   $550,000 Illinois Power Company 3⅛s Bonds due 1978

   In the event of a market decline, I will indemnify you for any losses you may sustain due to bonds being called for redemption or market decline.

In connection with Livingstone's sale through its nominee, Fine, of the $550,000 face value Illinois Power bonds to Industrial, the parties executed and delivered all the appropriate confirmations, instructions, memoranda, and documents customary in this type of transaction.

At a meeting held on September 30, 1954, Industrial's board of directors authorized a donation to Sonics of $44,000 face value Illinois Power bonds subject to a lien in favor of Connecticut in the approximate amount of $43,560. On October 15, 1954, Industrial offered to contribute $44,000 face value Illinois Power bonds to Sonics subject to a liability of $43,560; the offer was accepted by Sonics; and such

bonds were thereupon assigned on the same date. On October 18, 1954, Livingstone purchased from Sonics $44,000 face value Illinois Power bonds at 110¼ or a total principal amount of $48,510, plus interest of $305.55 and less tax of $22, or a net amount to Sonics of $48,793.55. On October 25, 1954, Livingstone paid $5,233.55 to Sonics representing the net proceeds due Sonics from its sale of $44,000 face value Illinois Power bonds after payment of the liability of $43,560 attributable to such bonds.

On October 18, 1954, Livingstone purchased from Industrial $506,-000 face value Illinois Power bonds at 110¼ or a total principal amount of $557,865, plus interest of $3,513.87 and less tax of $253, or a net amount to Industrial of $561,125.87. As a result of the sale by Industrial of the Illinois bonds in the face amount of $506,000, Livingstone remitted to Industrial $57,856.61. Details of the remittance are as follows:

Total proceeds from sale of $506,000 Illinois bonds_____ $561,125.87
Less: Interest on loan to Connecticut of $544,500_____ $2,329.26
Lien attributable to $506,000 Illinois bonds_____ 500,940.00    503,269.26
                                                                 _____
                                                                 $57,856.61

On October 26, 1954, Livingstone sold $170,000 face value Appalachian Electric bonds to Knowles at a price of 110½ or a principal amount of $187,850, plus accrued interest of $2,213.54, making a total price of $190,063.54. In connection with the Appalachian bond transaction Livingstone addressed and delivered a letter to Knowles dated October 26, 1954, which read, in part, as follows:

I have this day sold to you:

$170,000 Appalachian Electric Power 3⅛% of 1977 Bonds.

For $1.00 and other good and valuable consideration, receipt of which is acknowledged, I hereby grant you an irrevocable option to sell these bonds to me at any time or times through December 7, 1954 as follows:

$170,000 Appalachian Electric Power Co.
3⅛% of 1977 Bonds @ 108½

It is intended that the above identified bonds shall be used in exercising this option and the option, if exercised, shall be exercised through the sale by you to me of the above identified bonds. This option shall run in favor of you, your heirs, executors and assignees.

On October 30, 1954, Knowles paid $19,213.54 to Livingstone as part of the purchase price of the $170,000 face value Appalachian Electric bonds. By letter dated October 30, 1954, Knowles sent Philadelphia his executed promissory note payable to Philadelphia in the amount of $170,850 and instructed Philadelphia to instruct Chase to receive $170,000 face value Appalachian Electric bonds from Garvin or Livingstone against payment of $170,850. Knowles' loan from Philadelphia was arranged by Garvin acting as a note broker for Livingstone.

By letter dated October 30, 1954, Knowles instructed Livingstone to deliver $170,000 face value Appalachian Electric bonds to Chase or Bankers for Philadelphia and receive payment of $170,850. On November 8, 1954, Philadelphia accepted Knowles' promissory note; disbursed the proceeds of $170,850 to Livingstone according to Knowles' instructions; and received custody of $170,000 face value Appalachian Electric bonds as collateral security.

By letter dated December 9, 1954, Knowles offered to contribute to Sonics his $170,000 face value Appalachian Electric bonds subject to Philadelphia's lien for $170,850. Sonics accepted the offer on December 9, 1954, and Knowles on the same date assigned the bonds to Sonics. By letter dated December 9, 1954, Knowles advised Livingstone of his assignment of the $170,000 face value Appalachian Electric bonds to Sonics.

By letter dated December 9, 1954, Knowles instructed Philadelphia to instruct Chase or Bankers to accept instructions from Livingstone or Garvin to deliver the $170,000 face value Appalachian Electric bonds against payment of $170,850. On December 10, 1954, Sonics instructed Livingstone to liquidate its $170,000 face value Appalachian Electric bonds; discharge the lien attributable to such bonds; and remit the difference. On December 10, 1954, Livingstone purchased from Sonics $170,000 face value Appalachian Electric bonds at a price of 108½ or a total principal amount of $184,450, plus accrued interest of $206.60 and less tax of $85, or a net amount due Sonics of $184,571.60. On December 31, 1954, Livingstone paid Sonics $13,-721.60 representing the net amount due from its sale of $170,000 face value Appalachian Electric bonds after payment of the $170,850 lien to which such bonds were subject.

No agreement or understanding existed between petitioners and Livingstone whereby petitioners were required to sell back to Livingstone any of the bonds they had purchased from Livingstone. After their respective purchases of the Hartford Electric, Illinois Power, and Appalachian Electric bonds, petitioners were completely free to do whatever they wished with such bonds. Nor did any agreement or understanding exist which would require petitioners to divide with anyone else any profit they might make on such bond investments.

On their income tax returns for 1954 petitioners claimed bond premiums subject to amortization in the following amounts (excess of purchase price of the bonds over the amounts payable under the terms of the bonds) :

| Docket No. | Bond | Amount |
|---|---|---|
| 81970 | Hartford | $44,480.50 |
| 81970 | Illinois | 49,885.00 |
| 81976 | Appalachian | 17,000.00 |

Respondent's notice of deficiency disallowed the bond premium amortization deductions in full.

Hugh Knowles studied physics and mathematics at Columbia University, including undergraduate work and some work toward a doctorate. From 1930 to 1950 he was employed by Jensen Manufacturing Co., ultimately becoming a minority stockholder and director, in charge of engineering. As previously stated Industrial Research Products, Inc., was formed in 1946. At the outset Knowles and his wife each owned 25 percent of the stock and Robert Arnold owned 50 percent of the stock. It was formed exclusively to do Government work of a scientific nature. Knowles made an arrangement with Arnold that he be paid by the corporation on a per-hour basis for work he did for Industrial in the performance of the Government contracts. This amount paid to him would be billed to the Government department for which Industrial was doing development work. Industrial had similar arrangements with other scientists and engineers. In June of 1954 Knowles and his wife bought Arnold's stock interest in Industrial.

Knowles Electronics, Inc., was organized in August 1954. It is owned 51 percent by Knowles and his wife, with the balance, or 49 percent, held in trust for their three children.

In his 1954 joint income tax return Knowles reported salary received from Industrial in the amount of $22,250.93 and salary received from Knowles Electronic, Inc., in the sum of $3,840. In this return Knowles also reported Schedule C income of Hugh S. Knowles, 350 Forest Avenue, Glen Ellyn, Ill., consulting engineer, of $5.17 and business deductions of $4,538.86, or a net loss of $4,533.69. The Schedule C and an attached schedule show the business deductions comprise the following items:

| | |
|---|---:|
| Rent on business property | $750.00 |
| Depreciation of equipment | 1,020.61 |
| Dues and technical periodicals | 142.50 |
| Telephone and telegraph | 183.94 |
| Entertainment of customers | 500.00 |
| Gifts to customers | 39.03 |
| Cost of automobiles used in business | 1,862.51 |
| Miscellaneous | 40.27 |
| Total | 4,538.86 |

Schedules of the depreciable property and a breakdown of the automobile expense were also attached.

Respondent disallowed the $4,538.86 as a deduction on the ground that it did not represent "allowable business expense under Sections 161, 162, 167, 174, or any other section of the Internal Revenue Code of 1954."

OPINION

Petitioners in both dockets acquired certain bonds at premiums. Both the 1939 and 1954 Codes (as applicable to the transactions involved here) provide for deductions for bond premiums. Section 125(b)(1) of the 1939 Code and section 171(b)(1) of the 1954 Code as applicable here provide that the amount of the bond premium shall be computed with reference to the basis and "the amount payable on maturity or on earlier call date." The bonds in question were callable for redemption within 30 to 32 days from the date they were acquired. Petitioners computed the bond premiums to be the difference between the basis of the bonds and the amount payable at the earlier call date under the terms of the bonds and took deduction therefor. Respondent's notices of deficiencies disallowed the deductions *in toto* giving no reasons except to state the claimed amounts do not represent allowable deductions. Respondent's position now on brief is that petitioners are entitled to some deduction for bond premiums amortization but "the bond premiums are no greater than the difference between the basis of the bonds over the 'put' price of the bonds."

There is just no authority or justification for computing the amount of the premium with reference to the "put" or "buy-back" agreement petitioners had with the seller of the bonds. The identical statutes in both Codes are plain. They provide that "the amount of bond premium, * * * shall be determined" with reference to the amount of the basis and "with reference to the amount payable on maturity or on earlier call date." Sec. 125(b)(1), I.R.C. 1939; sec. 171(b)(1), I.R.C. 1954. Obviously "earlier call date" means a date mentioned in the indenture.

Respondent supports his present computation of the amount of the bond premiums by an argument that amortization of bond premium is limited to the amount of economic risk incurred and he argues that by reason of the put agreements petitioners incurred no economic risk greater than the difference between the bases of the bonds and the respective put prices. There is no merit in the argument. There is nothing in the statutes or in the legislative history of the pertinent sections which gives the slightest hint that the purpose of the legislation, allowing a bond premium deduction, is to allow a tax-free recovery of an amount that is subject to the risk of loss. In *Hanover Bank* v. *Commissioner*, 369 U.S. 672, the Supreme Court interpreted section 125 of the Internal Revenue Code of 1939 and reviewed its legislative history and subsequent amendments and also its earlier opinion interpreting the same statute in *Commissioner* v. *Korrell*, 339 U.S. 619. The purpose of this legislation is to allow the bond purchaser to recover a capital investment he makes in the form of the premium.

This is best shown by the following quotation from *Hanover Bank*, *supra:*

Bond premium is the amount a purchaser pays in buying a bond that exceeds the face or call value of the bond.[8] When a bond sells at a premium, it is generally because the interest it bears exceeds the rate of return on similar securities in the current market. For the right to receive this higher interest rate the purchaser of a bond pays a premium price when making the investment. However, interest is taxable to the recipient, and when a premium has been paid the actual interest received is not a true reflection of the bond's yield, but represents in part a return of the premium paid. It was to give effect to this principle that Congress in 1942 enacted Section 125 of the 1939 Code,[9] which for the first time provided for amortization of bond premium for tax purposes. [Footnotes omitted.]

The fact that petitioners had a contract with their seller which might insulate them against loss in the event of a call, has no effect on the amortization of the bond premium. As stated in *Hanover Bank, supra:* "The statute in issue here, in plain and ordinary language, evidences a clear congressional intent to allow amortization with reference to any call date named in the indenture." It is just as plain that the "amount payable" must be determined with reference to the indenture and not with reference to the terms of some agreement with a party other than the issuer. We hold petitioners were entitled to bond premium amortization deductions measured by the difference between their bases and the amounts payable at the earlier call date as provided in the bond instruments.

The remaining issue is in Docket No. 81976 where Knowles took a total deduction of $4,538.86 as expenses of the business he allegedly carried on from his home in 1954 as consulting engineer. Since respondent disallowed this in full, Knowles' first burden was to establish his engagement in the business as a consulting engineer during the year 1954. Section 162(a), I.R.C. 1954, allows "as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business."

At the outset it is to be observed that Knowles has, at least since about 1930, been engaged in the business of a corporate executive and employee. We are here concerned with whether, in the year 1954, he was also engaged in another business carried on from his home. None of the so-called business expenses would be ordinary and necessary expenses of carrying on his business of a corporate executive and employee though such expenses actually operate as a deduction from such salary and wage income since the receipts from the alleged business carried on at his home did not equal $4,538.86.

We are of the opinion Knowles failed in his burden of establishing that he was carrying on the business of a consulting engineer in 1954.

Knowles testified that when he was with Jensen during the depression years and Jensen was unable to fully compensate him, he made an arrangement with Jensen to work half time for Jensen and half time for noncompeting firms. During this period he did some work for Hammond Instrument Co., Zenith Radio Corp., Shure Brothers (electronics), and Hotpoint Division of General Electric Co., and he was paid for his work by these firms. In 1946 he formed and went to work for Industrial in which corporation he was an officer and director. There is no evidence that he derived any income from work for any other firm after 1946 until 1954 when he received the reported sum of $5.17. He testified that in 1953, 1954, and 1955 he performed work for the Powdered Metal Products Division of the Yale & Towne Manufacturing Co. The work was on the magnetic properties of soft ferrites. His arrangement with Powdered Metal Products was that he would receive no income unless the product was successful. If successful, he would receive 7½-percent commission on the sales of all ferrite products on the first $100,000 of sales and 2½ percent thereafter on the balance of the sales per annum. After the product was developed (and he testified Powdered Metal Products was a customer of Industrial and Industrial aided in the development) the work Knowles did seemed to be calling on customers of Powdered Metal Products who used the so-called ferrite products. He received total commissions from Powdered Metal Products of $365.93, of which $5.17 was paid in 1954 and the balance in 1955. Knowles testified Powdered Metal Products expected annual sales of $100,000, but another firm came out with a superior product so the venture was a failure. But the point is that one isolated job, really no more than a contingent venture, during a period ranging from around 1946 to at least 1956, does not evidence the carrying on of an engineering consulting business. Carrying on a business connotes something more than a single engagement in a transaction which might or might not result in profit. *McDowell* v. *Ribicoff*, 292 F. 2d 174; *Higgins* v. *Commissioner*, 312 U.S. 212.

It is true that in 1952 and 1953 Knowles took much the same deductions as in 1954, including his automobile expenses and rental for a portion of his home (which incidentally in 1954 he owned), and during these years he deducted the expenses from what he reported as Schedule C income ($12,305.50 in 1952 and $12,211.80 in 1953) as consulting engineer. However, he admitted on cross-examination that this so-called Schedule C income for those years was all paid to him for work he did for Industrial. He testified he was president of and an employee of Industrial and during 1952 and 1953 was paid on a per hour basis under a special arrangement with the other stock-

holders—his wife and Arnold. It fairly appears from the record that the work he did for Industrial during 1952 and 1953 was no part of his alleged home consulting engineering business. It is significant that in 1954, when he bought out Arnold in June, he reports everything received from Industrial as wages ($22,250.93) and nothing from Industrial as Schedule C income. The same is true with respect to 1955 when he reports everything received from Industrial as wages and reports his Schedule C income as $360.76 (the balance of commissions from Powdered Metals) and similar expenses for his home business of $3,839.30.

Knowles argues that other activities before and after 1954 evidence his being engaged in the business as a consulting engineer. He testified he was chairman of the Acoustics Panel of the Research and Development Board; that he was a member of the National Research Council, Mathematical and Physical Sciences Division; that he acted as consultant for the Veterans' Administration; that he delivered a technical paper at the International Congress on Acoustics; and that he rendered consultant services for Northwestern and Purdue Universities. None of these engagements are any evidence of his carrying on a home business of consulting engineer. He was paid nothing for these activities and he testified he did not conduct these activities for the purpose of being paid—they were to enhance his standing as an engineer. Under any definition, a business means a course of activities engaged in for profit. Acts engaged in which are admittedly for a purpose other than profit do not evidence business engagement.

One other engagement in 1954 should be mentioned. Knowles testified he spent about a month in 1954 working on a sound system he would propose for a band shell for the Chicago Park District. It is not clear that he expected any profit from this. He said he would be paid nothing unless it was installed and only then if he built it or could get a commission out of the organization that did build it. He ended by saying "It was partly remunerative and partly to improve my stature as a consultant in acoustics that the project was worked on." The evidence is of no value to support his claim of carrying on a business.

Petitioner testified he used stationery with his name as consulting engineer and his home address and that he paid an extra sum to have his home telephone listed in the yellow pages of the telephone book as a consulting engineer. Such evidence merely shows that Knowles called his home activities a business. The issue as to whether they actually constituted carrying on a business is still to be determined by examination of the facts as to what he actually did that would constitute carrying on a separate business in his home.

In his original petition Knowles alleged that the business deductions were justified in connection with his business as a consulting engineer. By an amendment filed at the commencement of trial he added the allegation that the said expenses were also justified by reason of his carrying on a business as an inventor. It is enough to say the record here does not support the claim that during the year 1954 Knowles was engaged in the business of inventing. He testified that some 14 patents had been issued to him, some being for other firms, and in all there were about 34 patents and pending patents. The patents seemed to have been issued in years after 1954 and though he testified he worked on inventions in 1952 and 1953, it is not clear that he even worked on inventions, that later became the subject of patent applications, during the year 1954. At any rate the mere working on inventions during the year in question with no activity of offering them for sale or license, would be insufficient to show engagement in an inventing business. All of Knowles' patent royalty income came in the years 1956 and following years from patents he leased to their family corporation, Knowles Electronics.

We hold responded was right in disallowing the claimed business expense deduction in the sum of $4,538.86. There were other issues settled or conceded, so—

*Decisions will be entered under Rule 50.*