Everell E. Fisher and Susan Briggs Fisher v. Commissioner.
Fisher v. Commissioner
Docket No. 866-66.
United States Tax Court
T.C. Memo 1968-212; 1968 Tax Ct. Memo LEXIS 84; 27 T.C.M. (CCH) 1048; T.C.M. (RIA) 68212; September 24, 1968. Filed *84 Held: The horse racing and horse breeding activities carried on by petitioner fell short of being a business in 1960 and 1961 and claimed losses resulting therefrom were properly disallowed. Held, further, the horse racing and horse breeding activities carried on by petitioner in 1962 and 1963 constituted a business and petitioner was entitled to deduct the losses resulting therefrom. Jerry D. Luptak, 3000 Guardian Bldg., Detroit, Mich., and Basil *85 M. Briggs, for the petitioners. Joseph F. Dillon, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent determined deficiencies in petitioners' income tax for the years 1960, 1961, 1962 and 1963 in the amounts of $11,977.15, $14,310.23, $35,119.49 and $33,890.81, respectively. During the years in question petitioner Susan Briggs Fisher carried on horse racing and horse breeding activities and the issue here is whether such activities constituted the carrying on of a trade or business so that she was entitled to deduct the losses sustained in connection therewith. Findings of Fact Some of the facts have been stipulated and they are found accordingly. The petitioners are husband and wife who, at the time the petition was filed in this case and for all years in issue, resided at 927 Lone Pine Road, Bloomfield Hills, Michigan. They filed joint Federal income tax returns for the years 1960 through 1963 with the district director of internal revenue, district of Michigan, at Detroit, Michigan. The issue involved in this case pertains only to Susan Briggs Fisher and she will be referred to as the petitioner. Begining about *86 1950, petitioner began carrying on horse racing and horse breeding activities. The establishment of a horse racing and horse breeding business starts with procuring thoroughbred mares and having them bred to thoroughbred stallions. When the colts are old enough they are entered in races and if they become winners, have them stand at stud. The winning reputation will cause individuals to desire to breed their mares to such horses. In the beginning petitioner had only one or two mares. Some of the foals of these mares were raced and some were sold. During the years involved in this case petitioner carried on her horse racing and horse breeding activities at Thimble Farms where her home was located. She used eight to ten acres of this property and the barn for her horse racing and horse 1049 breeding activities. In 1956, petitioner, John R. Davis, and Betty C. Maloney, formed a partnership under the name of Bloomfield Hills Stables. Davis was a retired Ford Motor Company executive and the owner of a cattle farm. Betty C. Maloney owned a horse farm in Warrenton, Virginia. The articles of partnership they executed recited they would be equal partners and the principal place of operation *87 would be at Warrenton, Virginia, and the business would be "breeding, raising, racing, showing and dealing in horses and livestock of all kinds." In 1957 Betty C. Maloney withdrew from the partnership but Davis and petitioner continued to carry on the same business under a new oral partnership agreement whereby they were to be equal partners. The name of the business was changed to Try-Angle Stables and its place of operation was Thimble Farms and petitioner actually carried on the partnership business. This partnership business continued until December 31, 1961, when petitioner bought out Davis and the partnership was dissolved and petitioner continued her horse racing, and horse breeding operations under the name of Susan B. Fisher Stables. The partnership returns of Try-Angle Stables showed the following losses for each year of its existence: Year
Losses
1957
$ 3,325.80
1958
21,417.12
1959
36,369.09
1960
42,382.22
1961 37,552.95
Total
$141,047.18 It is stipulated that these partnership returns were accepted as filed and upon audit of petitioner's and John R. Davis' returns for those years the said partnership losses were not disallowed. During all *88 of the years the partnerships were in existence petitioner continued some of the individual horse racing and horse breeding activities that she had started back in 1950. During 1950 to 1956 she sent her mares to Kentucky to be bred because there were no good stallions standing in Michigan at that time. The mares would be brought back and foaled in Michigan so the foals would be eligible to race in Michigan. During these early years of her horse racing and horse breeding activities petitioner and others formed the Michigan Thoroughbred Breeders and Owners Association. The first meeting of the association was held in petitioner's home. The association was formed to obtain the assistance of the Michigan Legislature and Michigan Racing Associations and owners of race tracks to foster the Michigan horse racing and breeding business as a profit industry in the State of Michigan. Petitioner was active in formulating the policies of the association and in carrying out those programs which helped to accomplish the objective of establishing the horse racing and horse breeding industry in Michigan. The following is a schedule of the horses owned by petitioner on December 31st of each of the *89 years involved here: Dec. 31, 1960
Dec. 31, 1961
Dec. 31, 1962
Dec. 31, 1963
Fancy Dancer, brood
Fancy Dancer
Sound Trick
Sound Trick
mare
Joy Forever
Fleeting Fancy
Forever Hopeful
Joy Forever, brood
Red Sword
Forever Hopeful
Prime Duke
mare
Blue Lu
Prime Duke
Ho Say Guy
Red Sword
Mr. Deliberate
Ho Say Guy
Tricky Pete
Blue Lu
(1/2 interest)
Tricky Pete
Lotta Genes
Mr. Deliberate
Devious/Picture-filly
Lotta Genes
Sister Jive
(1/2 interest)
(Hi Kid)-(1/2 interest)
Sister Jive
Spy Star
Also owned a 1/2 in-
Sub Fleet/Blue Lu-filly
Sujax Babe
Mister Joy
terest in a race horse
(Got Idea)
Spy Star
Bouncing Check
named "Picture" in 1960,
Whileurup
Certain Trick
but sold to the other
Mr. Joy
Fancy Dancer
half owner in March of
Bouncing Check
Joy Forever
1960
Certain Trick
Got Idea
Certain Fleet
Anne Noble
Fancy Dancer
Chief Pilot
Joy Forever
Hi Kid
Hi Kid (1/2 interest)
McAwful
Anne Noble
New Deck
Got Idea
Flenange
Chief Pilot
Red Sword
Blue Lu
Picture/Piet-1963 filly
Mr. Deliberate
(Dutch Maid)
(1/2 interest)
Red Sword 1050 Mr. Deliberate *90 was a show horse and the horses owned by petitioner on December 31, 1960 and 1961 were brood mares with the exception of Red Sword, a stallion standing at stud. In addition, petitioner owned a one-half interest in a racing horse named "Picture" in the year 1960 but she sold her interest to the other one-half owner in March of 1960. She also owned another horse "Long Star" in 1960 that was sold before December 31st. The joint income tax returns filed by petitioner and her husband indicate their principal sources of income for the years in question were from dividends received by both taxpayers. The return for 1960 merely showed the joint dividend income of both was $206,235. The following is a schedule showing the dividend income of each as shown by the income tax returns for the years 1961, 1962 and 1963: Year
DividendIncome ofEverell E.Fisher
Dividend IncomeofSusan Briggs Fisher
Total
1961
$129,266
$94,249
$223,515
1962
142,689
87,845
230,534
1963
130,967
86,938
217,905
Petitioner had her own set of racing colors: cyclamen red with a light blue sash and a blue cap. Try-Angle had its own racing colors and during the years Try-Angle was in *91 existence petitioner could not, under the rules of the Jockey Club, race horses under her colors. Her racing colors were retired during the years 1960 and 1961 and she did not enter any horses in any races during those years. During 1962 and 1963, the petitioner raced certain horses. The horses involved, the position they placed in each event they were entered, the total number of events entered for each horse and the purses they won are set out below: *11
Position
Number of
Total
Year
Horse
1st
2nd
3rd
4th
0
Events
Purses
1962
Sound Trick
3
2
0
2
1
8
$10,190.00
Mister Joy
0
1
0
0
1
2
460.00
Sister Jive
2
2
0
1
9
14
3,555.00
Sujax Babe
2
4
2
3
8
19
5,495.00
Prime Duke
3
4
1
2
3
13
6,795.00
Certain Fleet 1
0
0
1
7
9
1,200.00 11
13
3
9
29
65
$27,695.00
1963
Sound Trick
0
0
1
1
3
5
$ 990.00
Mister Joy
3
1
3
1
8
16
7,931.00
Sujax Babe
2
1
0
1
4
8
4,280.00
Prime Duke
0
2
2
1
8
13
2,231.00
Forever Hopeful
0
2
0
1
8
11
1,465.00
Hi Kid
0
1
1
1
1
4
1,882.50
Whileurup
0
0
0
1
2
3
220.00
Tricky Pete 0
1
2
0
0
3
1,250.00 5
8
9
7
34
63
$20,249.50
*92 The gross receipts, expenses including depreciation expense, and losses (gains on the sales of horses not included in computing said losses), incurred by the petitioner in her horse racing and horse breeding activities for the years 1950 through 1963 and those same items as claimed by the petitioner in the Federal income tax returns which she filed for the years 1964 and 1965 are set out below: Year
Gross Receipts
ExpensesIncluding Depreciation
Loss
1950
$ 2,176.45
$ 4,472.18
$ 2,295.73
1951
2,093.55
6,288.20
4,194.65
1952
1,184.88
4,852.70
3,667.82
1953
120.92
5,916.76
5,795.84
1954
4,798.41
15,837.76
11,039.35
1955
2,079.38
14,724.10
12,644.72
1956
$ 11.65
$ 14,920.33
$ 14,908.68
1957
700.44
25,667.57
24,967.13
1958
3,729.16
19,074.90
15,345.74
1959
7,859.78
19,959.80
12,100 .02
1960
448.27
17,617.57
17,169.30
1961
890.68
20,027.43
19,136.75
1962
29,118.84
78,433.36
49,314.52
1963
24,917.35
81,464.98
56,547.63
1964
16,788.18
72,414.92
55,626.74
1965
44,138.63
105,522.55
61,383.93
Totals
$141,056.57
$507,195.11
$366,138.55
Petitioner had a salaried bookkeeper who kept the books that *93 reflected the income and expenses in her horse operation during the years in question. The books consisted of ledgers in which the bookkeeper made 1051 entries, usually every day. Petitioner rented the basement of the bookkeeper's home for her office from which she conducted her horse activities. In 1964 petitioner purchased Pharamond Farm near Holly, Michigan, and remodeled the farm into a modern breeding farm. In May of 1965 petitioner purchased another farm and going horse business located at Metamora Township, Lapeer County, Michigan. The next year she sold the farm (for a $10,000 profit) but she retained the horse business and moved it back to Pharamond Farm. Later petitioner purchased another farm about a mile and a half from Pharamond where she temporarily boards out-of-state mares sent for breeding at Pharamond Farm. Opinion In the petition filed in this case petitioner alleged she was "engaged in the business of breeding and racing horses during the years involved herein with a reasonable expectation of profit." In order to prevail, petitioner had the burden of proving *94 her horse racing and horse breeding operations, carried on by her as an individual, were conducted by her as a business with the intention of making a profit so that her "expenses" could be deducted from business income under section 162(a), I.R.C. of 1954, and her "losses" deducted as "losses incurred in a trade or business" under section 165(c)(1), I.R.C. of 1954. Industrial Research Products, Inc., 40 T.C. 578 (1963); Henry P. White, 23 T.C. 90 (1954), affd. per curiam 227 F. 2d 779; Margit Sigray Bessenyey, 45 T.C. 261 (1965), affd. 379 F. 2d 252 (1967). Whether or not petitioner had the requisite intention or expectation of making a profit in the horse racing and horse breeding activities carried on by her in her individual capacity is a question of fact which must be determined from all of the evidence. Margit Sigray Bessenyey, supra; Frederick A. Purdy, 12 T.C. 888. The presumption of correctness that attaches to respondent's determination of deficiencies, casts the burden on petitioner to show her horse racing and horse breeding *95 activities in each year constituted the carrying on of an individual trade or business. We can consider the years 1961 and 1962 together. These were the last two years of the Try-Angle partnership that was being operated at Thimble Farms. Petitioner was a one-half partner in Try-Angle and the fact that the partnership was engaged in the business of breeding and racing horses is not questioned. In her income tax returns for these years petitioner took deductions for one-half of Try-Angle's claimed losses which were in the total sums of $42,382.22 in 1960 and $37,552.95 in 1961. These losses were not disallowed. Davis, the other partner in Try-Angle, testified he knew nothing about horse breeding and horse racing and it fairly appears all of the business of the partnership was carried on by petitioner at Thimble Farms. But petitioner claims that at the time she was engaged in carrying on the partnership business of breeding and racing horses at Thimble Farms she was also carrying on an individual business of breeding and racing horses at Thimble Farms. The evidence falls far short of proving the existence of the individual business. Petitioner testified she did not enter any horse *96 that she individually owned in any race in 1960 or 1961. She testified she did not have a license to race horses in Michigan in 1960 or 1961. She testified that she would be barred under the rules of the Jockey Club from racing any horse under her colors when horses from Try-Angle in which she was a partner were racing under Try-Angle's colors. She testified her colors were, in effect, retired by the Jockey Club while she was a partner in Try-Angle. Petitioner did not individually own any race horses in 1960 or 1961. She did own a one-half interest in a race horse named "Picture" for a few months in 1960 but the horse was sold to the other half owner in March of 1960. Petitioner's own testimony is sufficient to show that she did not consider herself in any individual business that included racing of her horses. She testified that none of the five or six horses that she owned in 1960 and 1961 could be raced with the exception of "Picture." She testified: A I only operated one horse in my individual capacity and that was Picture. When she was sold, that was the end of it. Q For the years 1960 and 1961? A When she was sold, then I operated strictly as Try-Angle Stables. As *97 stated earlier, she only owned a half interest in "Picture" and this horse was not entered in any race and was sold in March of 1960. At another place in her testimony 1052 petitioner testified flatly that she had no individual borse activities during the years 1960 and 1961. [1]
In other portions of petitioner's testimony it appears from her own statements that she was not engaged in any individual business of breeding race horses for a profit in the years 1960 and 1961. She owned about five brood mares but she testified *98 that her partnership arrangement was such that she would have these mares bred and turn the foals over to the partnership where they would race as a part of Try-Angle's racing business. She testified the expenses she incurred in 1960 and 1961 of $17,617.57 and $20,027.43, respectively, were in connection with the mares that she owned. The gross income from her horse activities in 1960 and 1961 of $448.27 and $890.68, respectively, was from boarding horses. It is difficult to see how she could ever expect to realize a profit in any idcividual horse breeding venture when she paid expenses for the keep and breeding of the mares she owned and turned the foals over to the partnership. Without any further review of the evidence we hold petitioner failed to sustain her burden that she was conducting a horse breeding and horse racing business as an individual with the expectation of making a profit in the years 1960 and 1961 and she is not entitled to deduct the claimed losses for her horse racing and horse breeding activities during those years. Our holding makes it unnecessary to consider other factors such as a long history of losses, great wealth that means ability to absorb losses, *99 and the great disparity between receipts and expenses. The presence of these factors might well sustain the inference that petitioner's horse racing and horse breeding activities in 1960 and 1961 constituted a hobby, or were for the purpose of bringing thoroughbred racing to Michigan. However, we need not determine petitioner's intent in conducting her horse racing and horse breeding activities in 1960 and 1961. It is enough to say she failed to prove the horse racing and horse breeding activities she conducted in those years constituted a horse breeding and horse racing business carried on for profit. We believe petitioner has met her burden of proof with respect to the years 1962 and 1963. There is sufficient evidence to show she was engaged in a horse breeding and racing business for profit in these two years. It should be noted at the outset that her horse activity, beginning in 1962, was a combination of the activity she carried on for Try-Angle partnership which was admittedly a business and her own individual activity which, as we have indicated in years prior to 1962, fell short of being an individual business carried on for profit. The combination of the two adds up to the *100 conduct of a business. At the end of 1961 petitioner purchased John R. Davis' share in Try-Angle. She changed the name of the activity to Susan B. Fisher Stables. It is stipulated that she opened a bank account on January 1, 1962 in the name of Susan B. Fisher Stables and the same month letterheads for Susan B. Fisher Stables were printed and first used. There is evidence that the breeding and racing activities of petitioner in the years 1962 and 1963 was rather extensive. No longer were foals, produced by her mares, turned over to a partnership. And the foals that had been turned over to the partnership were now in her racing stable. This is evidence that some 10 foals were produced by petitioner's mares in the four year period here involved. The evidence shows she began a rather extensive racing program. During the year 1962 petitioner had six horses entered in 65 racing events. Her horses placed first 11 times, second 13 times, third 3 times, fourth 9 times (sometimes there is a purse for fourth or fifth), and out of the money 29 times. In 1963 petitioner had eight horses entered in 63 racing events. Her horses placed first 5 times, second 8 times, third 9 times, fourth 7 times, *101 and out of the money 34 times. There is evidence that it takes six to nine years before a horse racing and breeding business will begin to show a profit. And even then the profits are largely dependent on the raising of race horses that develop 1053 good track records and become attractive stallions to be used for breeding purposes. We have held petitioner was not operating an individual horse breeding and racing business in 1960 and 1961. The long history of losses in horse operations in an individual capacity is immaterial. The business which petitioner was operating in 1962 and 1963 was a successor to the partnerships which had a history of losses extending back to 1956 when the first partnership was formed. There is evidence here that in the years after the years in issue petitioner's horse racing and horse breeding business began to show a profit. In 1964 petitioner began to expand her horse racing and horse breeding business by buying a farm which was converted into a breeding farm where she has a standing stallion. The next year she bought another farm which she sold and later she bought another farm where she has facilities for boarding horses. She also raises hay and *102 grain on these farms. Her accountant testified that the racing stable made money in 1966 but the operation of the racing stables was combined with the general farm operation under a single heading on the income tax return and this showed a loss. There is evidence that petitioner advertised her stallion's services in horse racing periodicals in 1964 and 1965 and used her own printed forms for stallion service contracts. On the whole record we are convinced that petitioner was engaged in the business of conducting a breeding and racing business for profit in the years 1962 and 1963 and she is entitled to deduct the losses incurred in said business. Decision will be entered under Rule 50. Footnotes
1. Q. Now, you have testified, Mrs. Fisher, that you spent 100 per cent of your time during the years 1960 through 1963, if I am not mistaken, on your horse operations; is that correct? A. I believe that's correct. Q. And because of the fact that the partnership activities were going on in 1960 and in 1961, your time therefore, would have had to have been split between the activities of the partnership and your own individual activities; is that correct? A. No, that is not correct, I had no individual horse activities, other than the partnership. Q. For those two years? A. As long as I was in the partnership I gave my full time to the partnership.↩