JEAN MALCHIN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Malchin v. Commissioner
Docket No. 1643-77.
United States Tax Court
T.C. Memo 1981-460; 1981 Tax Ct. Memo LEXIS 286; 42 T.C.M. (CCH) 847; T.C.M. (RIA) 81460; August 25, 1981. *286 Petitioner learned of E's interest in going public with his record company and of H's interest in acquiring a record company. Petitioner telephoned E and H and advised each of the other's interest. Negotiations between E's and H's representatives resulted in H's company acquiring E's company. Ultimately, petitioner shared in a finder's fee. Held: Petitioner's finder's fee income was not derived from a trade or business, within the meaning of sec. 172(d)(4), I.R.C. 1954. Sidney Gelfand, for the petitioner. Arthur H. Boelter and Byron J. Furseth, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined a deficiency in Federal individual income tax against petitioner for 1972 in the amount of $ 3,290. In his petition, petitioner claimed an overpayment of "approximately $ 4200". In his amended petition, petitioner claimed, in addition, an investment credit of $ 3,916.70. The issue for decision is whether an amount received by petitioner in 1973 is income derived from a trade or business for purposes of sec. 172(d)(4), [1] the nonbusiness deduction modification used to compute petitioner's 1973 net operating loss (and therefore the *287 amount, if any, available for carryback to 1972.) [2]
FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and stipulated exhibits are incorporated herein by this reference. When the petition in this case was filed, petitioner resided in New York, New York. In 1972 and 1973, petitioner was in the business of raising horses and had been so engaged for many years. In 1967, Elliot Hyman (hereinafter referred to as "Hyman") was a friend of petitioner and was a former business partner of petitioner in racing horses. At that time, Hyman was chairman of the board of Warner Brothers Seven Arts (hereinafter referred to as "Warner"). That year, petitioner heard Hyman tell people that he (Hyman) might be interested in acquiring record companies. Also in 1967, Atlantic Recording *288 Corporation (hereinafter sometimes referred to as "Atlantic") considered the possibility of going public. At this time, Atlantic's three principal shareholders were Ahmet Ertegun (hereinafter sometimes referred to as "Ertegun"), Nesuhi Ertegun, and Gerald Wexler. Ertegun mentioned this consideration of going public to Thomas Kempner (hereinafter referred to as "Kempner") of Loeb, Rhoades & Co. (hereinafter referred to as "Loeb Rhoades"). On hearing Hyman's comments, petitioner recalled that he had previously met Ertegun at a social gathering. Petitioner telephoned Ertegun and asked if he would be interested in Atlantic being acquired by Warner. Ertegun told petitioner that he was interested. (This telephone call was the only conversation petitioner had with Ertegun about the matter.) Petitioner then telephoned Hyman with this information. Loeb Rhoades contacted Hyman on behalf of Ertegun concerning the possible acquisition of Atlantic by Warner. Loeb Rhoades communicated to Atlantic that a merger possibility was a preferable way of going public, and that Loeb Rhoades had people they thought would be interested in a merger. Based on some financial information that Atlantic had *289 given to Loeb Rhoades, Loeb Rhoades told Atlantic that Loeb Rhoades had a merger offer from Warner. A meeting in Atlantic's offices to discuss Warner's merger offer was arranged. Present at this meeting were representatives of Warner, Atlantic, and Loeb Rhoades. Negotiations broke off after this meeting because Atlantic felt Warner's offer was insufficient. Several weeks later, negotiations resumed; these negotiations were conducted by representatives of Warner and Atlantic. Loeb Rhoades did not participate in these further negotiations, but was kept advised of what was happening. At these meetings it was unnecessary for someone qualified along the lines of a broker or finder to be present. These negotiations led to a satisfactory arrangement for a merger. During the negotiations, the negotiators concerned themselves with the amount to be paid by Warner, the terms of the employment or relations of the three principal stockholders of Atlantic to the combined corporation, the payout, and the terms of the payoff. Petitioner did not participate in any of the negotiations. Theodore Jaffe (hereinafter referred to as "Jaffe"), principal negotiator for Atlantic, never met petitioner. *290 Alan Hirschfield, a director and financial vice president of Warner and a negotiator for Warner, had no personal knowledge of any part that petitioner may have played in the negotiation of the merger. Kempner, who participated to some extent in the negotiations, had no recollection of the role of petitioner in the negotiations. One day Human told petitioner that a deal had been made between Warner and Atlantic. Hyman also told petitioner that Loeb Rhoades had approached Warner in the name of Ertegun. Human told petitioner that Hyman would "protect" him. Shortly after the preliminary arrangement for a merger had been made, Hyman told Jaffe and others that petitioner had called Hyman to remind him that petitioner was the one who had mentioned Atlantic to Hyman. By letter dated November 20, 1967, the three principal shareholders of Atlantic confirmed to Loeb Rhoades the terms of their agreement pursuant to which Loeb Rhoades had acted as broker or finder in connection with the proposed sale of their stock in Atlantic to Warner; the letter stated that if the sale takes place and the purchase price is paid, Loeb Rhoades is to be paid 0.854 percent of each purchase price payment received, *291 to a maximum of $ 150,000. Petitioner approached Kempner at Loeb Rhoades' office. Kempner offered him $ 10,000 of Loeb Rhoades' fee. Petitioner telephoned Hyman, who spoke with Kempner. By letter dated November 30, 1967, Loeb Rhoades agreed to pay petitioner one-third of any amounts received by them in accordance with the above-noted letter dated November 20, 1967. As payments on the merger were made, payments were made to Loeb Rhoades, and by Loeb Rhoades to petitioner. In 1973, Ertegun objected to making further payments to Loeb Rhoades because of a dispute between Ertegun and Loeb Rhoades. In 1973, petitioner sued Loeb Rhoades and the three principal shareholders of Atlantic for $ 9,572.31, which was one-third of the difference between $ 150,000 and what Loeb Rhoades had been paid. In the complaint, petitioner alleged, inter alia, (1) that in or about November 1967, he learned that Atlantic and its stockholders were interested in selling their stockholdings in Atlantic, (2) that petitioner informed Human of this situation, and (3) that petitioner thereafter "was instrumental in arranging for meetings between the principals" of Atlantic and Warner. Atlantic and its three principal *292 shareholders, who were not interested in a protracted lawsuit but were not prepared to admit the liabilities of Loeb Rhoades, arranged with petitioner's attorneys for an assignment of his claim against Loeb Rhoades to Jaffe in return for $ 9,572. On October 9, 1973, ptitioner received $ 9,572 and his action against Loeb Rhoades and the three principal shareholders of Atlantic was dismissed under stipulation, with prejudice. Ertegun provided Jaffe with the money to pay petitioner for his claim against Loeb Rhoades. Petitioner reported the $ 9,572 as commission income on his 1973 Federal income tax return. In 1972, petitioner together with two other persons bought a horse called Tarport Skipper from Delvin Miller (hereinafter referred to as "Miller"). Miller was a breeder, trainer, owner, and driver of horses, and friend of petitioner; he drove for petitioner, and sold horses to petitioner. The sales price was $ 170,000. Petitioner acquired a one-third interest in Tarport Skipper. Petitioner paid a lower price to Miller than did the two other buyers. Miller gave petitioner the lower price because of their long business relationship and friendship. Petitioner reported on his 1972 *293 Federal income tax return the difference between the lower price ($ 50,000) and the price paid by the two other buyers ($ 56,666.67) as commission income for his part in arranging the sale of the horse. On that same return he reported $ 4,263.17 as commission income from Loeb Rhoades, arising out of the 1967 transaction described supra. Other than the 1967 Warner-Atlantic transaction described supra, petitioner has never been involved in the acquisition of one company by another company. He has never worked as a broker or financial advisor. ULTIMATE FINDING OF FACT The $ 9,572 income received by petitioner in 1973 on account of the 1967 Warner-Atlantic transaction was not derived from a trade or business of petitioner. OPINION The parties agree that petitioner suffered a net operating loss in 1973, but disagree as to the amount of that loss and hence the amount, if any, available for carryback to 1972. Respondent maintains that petitioner's finder's fee constitutes business income and therefore petitioner's nonbusiness deductions cannot be used to offset such business income when computing petitioner's net operating loss for 1973. Petitioner asserts that the finder's fee constitutes *294 nonbusiness income and petitioner's nonbusiness deductions offset such nonbusiness income when computing petitioner's net operating loss for 1973. In other words, the character of the finder's fee income determines whether petitioner's nonbusiness deductions are "wasted". Cf. Yerkie v. Commissioner, 67 T.C. 388, 394 n. 2 (1976). We agree with petitioner. In general, a taxpayer is allowed to deduct for a taxable year the aggregate of the net operating losses sustained in other years that may be carried over to the taxable year (sec. 172(a)). The taxpayer's net operating loss for a year is the excess of deductions allowed over gross income, with certain modifications (sec. 172(c)). One such modification provides that a noncorporate taxpayer's nonbusiness deductions are allowed in the computation of the net operating loss for a year only up to the amount of the taxpayer's nonbusiness gross income for that year (sec. 172(d)(4)). The rationale for this limitation on nonbusiness deductions is to restrict the benefits of the net operating loss deduction under 172(a) to losses attributable to the taxpayer's trade or business. Todd v. Commissioner, 77 T.C.     (August 10, 1981) (slip *295 opin. at 9-10). The question before us is whether petitioner's finder's fee is "derived from [his] trade or business", within the meaning of section 172(d)(4). [3]
The term "trade or business" is not defined in the statute. Gentile v. Commissioner, 65 T.C. 1, 3 (1975). However, the term's meaning in section 172(d)(4) is the same as in section 162 [4] *296 ( Folker v. Johnson, 230 F.2d 906 (CA2d 1956)). Since the term's meaning in section 1402 [5] is also the same as in section 162 (with exceptions not here relevant), we may draw upon interpretations of sections 162 and 1402 in applying section 172(d)(4) in the instant case. Although various factors have been considered in determining whether a taxpayer's activities are a trade or business, each of these factors is only a guide and no one factor is conclusive. Green v. Commissioner, 74 T.C. 1229, 1235 (1980), and cases there cited. Viewing the record as a whole, we conclude that the $ 9,572 received by petitioner in 1973 was not derived from petitioner's trade or business. Although we reach this conclusion on the basis of the entire record, there are several factors which deserve brief discussion. First, nothing in the record suggests that petitioner held himself out to others as engaged in the selling of services as a finder. See Barrett v. Commissioner, 58 T.C. 284 (1972). Cf. Barnett v. Commissioner, 69 T.C. 609, 613 (1978). [6] *297 Second, petitioner's involvement in the merger apparently consisted merely of keeping his ears open, remembering a prior conversation, and making two telephone calls. Cf. Green v. Commissioner, 74 T.C. at 1235. His other activities related merely to the securing of his finder's fee. Third, although we are aware that a taxpayer may be engaged in more than one trade or business (see Wright v. Commissioner, 31 T.C. 1264, 1267 (1959), affd. per curiam 274 F.2d 883 (CA6 1960)), we are convinced that petitioner sought his livelihood by raising horses and not by arranging corporate mergers. Fourth, there does not appear to be any meaningful continuity in petitioner's role as a business matchmaker. Respondent points to the Tarport Skipper transaction as a second instance in which petitioner received a fee for bringing about a transaction. However, we think petitioner's explanation at trial that he got a better deal than the other buyers is not so incredible or in conflict with the remainder of the record as to justify our disbelieving it. Moreover, even if the Tarport Skipper transaction was properly characterized as a finder's *298 fee arrangement, we believe that continuity generally requires more than one very brief incident in 1967 followed by one brief incident of another sort in 1972. Industrial Research Products, Inc. v. Commissioner, 40 T.C. 578, 589 (1963). Respondent asserts that "wages, salaries, and fees for services rendered are business income and must be included in computing the net operating loss and can be reduced only by business expenses. * * * Similarly, commissions have been held to be business income within the same context". The point of the cases respondent cites, and many other cases, is that an employee is regarded as being in the trade or business of being an employee (contrary to the former interpretation that being an employee was not a trade or business). See Folker v. Johnson, supra.Petitioner, however, did not act as an employee and was not compensated as an employee. Respondent urges that "what is contemplated as nonbusiness income within § 172(d)(4) and its predecessor § 122(d)(5) [I.R.C. 1939] is passive investment income such as interest, dividends and oil royalties." We conclude that nonbusiness income includes income from a broader range of activities than that suggested *299 by respondent. See, e.g., Gentile v. Commissioner, supra, where respondent successfully contended that income from race track winnings and gambling was not income from a trade or business. Respondent notes that petitioner "even went so far as to bring suit to be paid." Since a person may sue to be paid a dividend or to be paid wages or to be paid an overdue account, petitioner's litigation activities are not relevant in determining the nature of the $ 9,572 received by him. Respondent points out that petitioner "alleged in his suit that he was 'instrumental'" in arranging the Warner-Atlantic transaction. The evidence in the record in the instant case describes petitioner's activities. We do not understand the word "instrumental" to be in necessary conflict with the conclusion we have reached. In accordance with the foregoing and because of concessions by the parties (see note 2, supra), Decision will be entered under Rule 155. Footnotes
1. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for 1973. See sec. 172(e)↩. 2. Petitioner concedes that he is not entitled to the claimed investment credit and that respondent's depreciation and rent adjustments are correct; respondent concedes that petitioner is entitled to a net operating loss carryback of $ 17,330 from 1974 to 1972.↩
3. SEC. 172. NET OPERATING LOSS DEDUCTION. (d) Modifications.--The modifications referred to in this section are as follows: (4) Nonbusiness deductions of taxpayers other than corporations.--In the case of a taxpayer other than a corporation, the deductions allowable by this chapter which are not attributable to a taxpayer's trade or business shall be allowed only to the extent of the amount of the gross income not derived from such trade or business. * * *↩
4. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * * 5. SEC. 1402. DEFINITIONS. (c) Trade or Business.--The term "trade or business," when used with reference to self-employment income or net earnings from self-employment, shall have the same meaning as when used in section 162 (relating to trade or business expenses), * * *↩
6. See generally Augustine & Fass, "Finder's Fees in Security and Real Estate Transactions", 35 Bus. Law. 485↩ (1980).