ARNOLD L. GINSBURG and JANE LEE GINSBURG, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ginsburg v. Commissioner
Docket Nos. 4741-69, 184-72.
United States Tax Court
T.C. Memo 1976-199; 1976 Tax Ct. Memo LEXIS 205; 35 T.C.M. (CCH) 860; T.C.M. (RIA) 760199; June 21, 1976, Filed Sidney Blumenberg and Ralph A. Matalon, for the petitioners. Larry Kars and Theodore J. Kletnick, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Additions to tax Year
Docket No.
Income Tax
Sec. 6653(b) [1]
Sec. 6654
1962
4741-69
$ 17,675.90
1963
184-72
417,050.67
$208,525.34
$139.01
1964
4741-69
14,228.74
*206 Because of concessions made by the petitioners, the only matters before the Court are: (1) whether petitioners devised and implemented a scheme to conceal executrix commission income to Jane Ginsburg as nontaxable receipts and, as a consequence, fraudulently omitted such income on their 1963 tax return, and (2) whether petitioners properly deducted certain cattle breeding, maintenance, and depreciation expenses on their 1963 and 1964 tax returns. FINDINGS OF FACT The stipulation of facts filed by the parties, together with the exhibits attached thereto, is incorporated herein by this reference. Petitioners, husband and wife who resided in Harrison, New York at the time of filing their petitions herein, filed joint Federal income tax returns for the taxable years 1963 and 1964. The 1963 return was filed with the district director of internal revenue, Manhattan District, New York. [2] Hereinafter petitioners will sometimes be referred to as Arnold and Jane. On April 24, 1959, Jane's father, *207 Lester Martin, died suddenly and unexpectedly at the age of 52, leaving a gross estate valued in excess of $22,000,000. By his Last Will and Testament dated May 1, 1958, Lester nominated the following persons as executors of his will: Sylvia Martin (wife) Jane Martin Ginsburg (daughter) Arnold L. Ginsburg (son-in-law) Jonah J. Goldstein (friend and retired judge of the court of general sessions, New York City) On November 12, 1959, Lester's will was admitted to probate and the above-named executors were issued letters testamentary. The will provided that, after payment of debts, the estate was to be distributed in equal shares to Sylvia Martin and to The Martin Foundation, Inc., a tax-exempt charitable corporation organized by Lester in 1946. The will made no provision for any of Lester's three surviving children, Jane Ginsburg, Robert Martin, and Alana Martin. [3] During his lifetime, Lester demonstrated a strong aversion to the payment of taxes; his will was drafted to accomplish a tax-free disposition of his sizable estate by optimal use of the estate tax deductions for dispositions to a surviving spouse and to charitable organizations. [4]
*208 Notwithstanding its simplicity, Lester's dispositive plan generated much ill will and litigation. [5] Three basic conflicts developed between petitioners and Sylvia Martin. The first conflict involved the valuation of estate assets and the allocation thereof between the two legatees. The bulk of Lester's estate consisted of securities; between one-third and one-half of the value of the estate consisted of approximately 571,000 shares of Windsor Industries, Inc. (Windsor), such shares representing about 57 percent of Windsor's issued and outstanding stock. [6] Windsor, a publiclyowned but inactively traded corporation, onwed a majority of the stock of Bates Manufacturing Company (Bates), a nationally known textile firm with annual sales in excess of $38,000,000 at the time of Lester's death. After her husband died, Sylvia Martin assumed certain of her husband's corporate officerships and directorships including the positions of President and Chairman of the Board of Bates and President of The Martin Foundation, Inc. All four co-executors of Lester's *209 will were directors of The Martin Foundation, Inc. Sylvia's performance in these corporate roles did not play to a receptive audience, particularly the co-executors of Lester's will whose displeasure with Sylvia led to the problem of how the Windsor stock in the estate was to be distributed to the beneficiaries. At first, Sylvia favored an equal division of the stock or a private sale; since the former would only perpetuate conflict and dissolve the valuable control of Windsor and since the latter would not yield adequate proceeds, the other executors would accept neither alternative. Because of their directorships of the foundation, [7] its acquisition of the Windsor shares translated into a potentially great economic benefit to the Ginsburgs who anticipated a secure, high-income managerial position for Arnold at Bates. At some point prior to the end of 1960, Sylvia accepted the idea of distributing all of the Windsor stock to the foundation and began to channel her energy toward obtaining the highest possible valuation of the Windsor stock so as to increase the amount of her one-half share of Lester's estate. In December, 1960, tax counsel for the estate completed and submitted *210 to the executors their proposed inventory and valuation of estate assets to be reported on the Federal estate tax return. The proposals included a valuation of Windsor stock at $17 per share which all of the executors, save Sylvia, found excessive. Disagreement ensued with the result that each of the four executors found it necessary to retain separate counsel and Sylvia initiated proceedings for the removal of her co-executors. The second major controversy arising from the administration of the estate involved Lester's failure to make any testamentary provision for his children. In the latter part of 1960 and the early months of 1961, counsel for Jane and Sylvia attempted to reach an agreement whereby Sylvia would make substantial *211 gifts to each of the children. The ball park negotiating figures were between $500,000 and $1,000,000 per child. No agreement could be had. In April, 1961, Sylvia had a disagreement with Jonah Goldstein, the drafter of Lester's will and a co-executor. This friction with Sylvia, coupled with his dissatisfaction that Sylvia was unwilling to make ample gifts to her children from her legacy, caused Jonah to tell Jane that, when Lester made his will he arranged with Sylvia that he would leave her one-half of his estate outright with the understanding that she would share the distribution equally with the three children (one-fourth of Sylvia's legacy each to Sylvia, Jane, Robert, and Alana). In April, 1961, Jane filed suit against her mother for the enforcement of an alleged oral trust pursuant to which Sylvia held three-fourths of her legacy for the benefit of her children. Robert Martin filed a similar suit in November, 1962. Alana Martin, a minor living with her mother during this period, and for whom a guardian had been appointed in the latter part of 1960 because the co-executors thought Sylvia was wasting Alana's assets, did not, however, file a similar claim. The third source *212 of tension between petitioners and Sylvia Martin was the issue of executor compensation, a point on which Lester's will was silent. From the outset, Sylvia resisted the payment of any executor commissions. Since Arnold had left his work in the securities investment field [8] in 1960 to devote his full attention to the estate administration, Arnold expected to be compensated for the same. Jonah Goldstein, the one executor who was not a family member, similarly expected compensation for his services. While Jane participated in the affairs of the estate to a lesser degree than her husband, she was kept informed of estate matters. From the start, Jane knew she would have difficulty in respect of any claim for compensation for her executrix duties because of Sylvia's opposition thereto. Cf. footnote 3, supra. *213 In the middle of 1961, the attorneys for the individual executors, at the direction of the surrogate's court, commenced active negotiations for the resolution of these three issues. The first proposed agreement was drafted by Jane's lawyer in June, 1961. After a number of proposed agreements and impasses, a final settlement was finally reached on February 2, 1963. During the negotiation period, the following applications for advance partial payment of executor commissions were made to the surrogate's court: October 24, 1961
Petition of Jonah J. Goldstein
and Arnold L. Ginsburg
November 30, 1961
Petition of Jane M. Ginsburg
December 3, 1962
Supplemental Petition of
Jonah J. Goldstein and Arnold
L. Ginsburg
December 3, 1962
Supplemental Petition of Jane
M. Ginsburg Each of these petitions set forth as grounds for advance payments: that the petitioning executors were faithfully discharging their duties, that the estate administration was protracted, and that a single lump sum payment for several years worth of services would result in harsh income tax consequences to the executors. As a result of these petitions, Jonah and Arnold each received *214 one $75,000 advance payment. Jane's claim was not pressed. Jane's petitions were prepared by her attorney as part of his strategy to spur the negotiations which had come to a standstill. In the give and take of the settlement talks, even while these petitions were pending, Jane was willing to forgo any commissions to which she might have been entitled upon the condition that Arnold receive his full share of commissions. [9] In the settlement process, all draft agreements after the first contained a provision for the waiver of commissions by Jane and Sylvia. The first draft, prepared by Jane's attorney, was done in haste at the direction of surrogate's court. The next draft, which was prepared by Sylvia's counsel in the fall of 1961 included such waiver provisions. In 1962, Jonah Goldstein resigned as an executor by leave of court. Jonah's resignation was precipitated in large part by the aspersions cast on his reputation in the course of *215 a separate and unrelated proceeding.The circumstances attending Jonah's resignation diminished the strength of Jane's action to impress an oral trust upon Sylvia's legacy since success in such action depended heavily upon Jonah's credibility as a witness. During subsequent negotiations, it became apparent that Sylvia's willingness to make gifts to the children was evaporating and also that Jane would be pressed to relinquish her suit to impress an oral trust on Lester's bequest of one-half of his estate to Sylvia. From 1951 until his death, Lester handled all of Jane's financial affairs, first in a guardian capacity and later under power of attorney from Jane. From 1956 until his death, Lester was concerned with building up an appreciable income-producing securities portfolio for his daughter. To this end, Lester borrowed funds and purchased securities in Jane's name. As was his custom, Lester also paid the income taxes incurred by Jane as a result of her ownership of securities bought by him; Lester occasionally borrowed funds in Jane's name in order to pay such taxes. [10]
*216 In 1958, Jane purchased a home in Harrison, New York. At the closing, a representative of Lester appeared with $70,000 for Jane to make such purchase. The money came from a loan that Lester had taken out in Jane's name. Jane had not asked for nor expected this money; nor had she asked her father to borrow the purchase price in her name. Upon receiving the $70,000, Jane and Arnold assumed that Lester was making a gift to his daughter. At the time of Lester's death, there was a $163,000 debt owing to the Kings County Trust Company (Kings County) for loans advanced to Lester in Jane's name. Also, Lester's estate held a promissory note from Jane dated August 18, 1958 in the sum of $37,000. This note represented cash transferred from Lester to Jane so that Jane could repay a prior indebtedness to Kings County which Lester had incurred in her name. Lester's estate also claimed as an asset a $70,000 loan receivable from Jane for cash with which Lester purchased some convertible debentures in Jane's behalf. Arnold had difficulty in obtaining compensation for his services to Bates and Windsor, during the period of estate administration, because of an alleged conflict of interest *217 arising from his role as executor of Lester's estate. As a result, Jane extended the Kings County loan account in her name in order to meet their living expenses and became indebted to Kings County for $145,750.14 after her father's death. The Federal estate tax return prepared for the Martin estate and filed on or about January 5, 1961, listed a single figure of $1,300,000 for estimated executors' commissions and attorneys' fees. Both the promissory note and the loan receivable were listed on the return as assets in the respective sums of $37,000 and $70,000. The $163,000 debt to Kings County was not listed as an estate liability. Although both petitioners were, as executors, given the calculations and schedules forming the basis of such return in advance of filing, neither voiced any objection to the characterization of these items at the time. [11] For other reasons however, pertaining to the valuation of the Windsor stock, the petitioners did not join with Sylvia in the signing of the estate tax return. [12]
*218 Notwithstanding their failure to object specifically to the estate tax return's characterizations of the $37,000 and $70,000 transfers, petitioners had always construed these to be gifts from Lester and never expected to make repayment to him or to his estate. At a meeting of the attorneys for the individual executors in June, 1962, Jane's attorney proposed that if the gift to Jane were to be withdrawn from the settlement agreement, Sylvia should, in return, satisfy the indebtedness incurred by Jane to Kings County after Lester's death, the estate should acknowledge the $37,000 and $70,000 transfers to Jane as gifts, and the estate should satisfy the $163,000 indebtedness to Kings County incurred by Lester in Jane's name. Sylvia never specifically responded to this suggestion; however, it was incorporated into the final settlement agreement of February 2, 1963. To reflect this part of the settlement, gift tax returns were filed by the estate in Lester's name reporting: Re Kings County
Re Direct Trans-
Indebtedness
fers to Jane
Amended 1958 return
$ 21,500
$ 37,000
(Gifts to Jane
70,000
70,000
Gisburg)
1959 return
37,500
(Gifts to Jane
9,000
Ginsburg)
25,000
$163,000
$107,000
*219 Lester's additional gift tax liability was satisfied by his estate. Also Sylvia filed a gift tax return for 1963 in which she reported as a gift to Jane Ginsburg the sum which she paid to Kings County to satisfy the debt incurred by Jane after her father's death. In addition to the foregoing, the 1963 settlement agreement provided for the valuation of the Windsor Stock at $13.00 per share and the distribution thereof to the foundation, Sylvia's resignation from the foundation's management, the establishment of the Sylvia and Lester Martin Fund, Inc. to which the foundation would transfer $2,000,000, the waiver of executrix commissions by Sylvia Martin and Jane Ginsburg, the payment of a partial executor commission to Jonah Goldstein, and the payment of a full executor commission to Arnold Ginsburg. The full commission to which Arnold was entitled, $370,372.24, was to be paid in installments of $75,000 each and was subject to an offset of $75,000 for the advance commission paid to him pursuant to his petition to surrogate's court therefor. Petitioners' 1963 Federal income tax return was prepared by Saul Sapper, an accountant who had prepared Arnold's returns for a number of *220 years. In respect of the settlement agreement, Arnold provided Sapper with information regarding his commission receipts from the Martin estate and provided him with a copy of a letter from Jane's attorney to Kings County which accompanied checks from Sylvia Martin and from the Estate of Lester Martin in satisfaction of the loans charged to Jane. The letter was marked "ACCEPTED" by Kings County. Arnold had put the following notation across the top of the copied letter, "Saul, Jane's loans now paid up." Upon receiving this from Arnold, Sapper called Arnold for further information. Arnold referred Sapper to Jane's attorney who, in turn, referred Sapper to Jane's tax counsel in respect of estate matters.Tax counsel informed Sapper that payments of the principal sums owing to Kings County constituted nontaxable gifts to Jane. Accordingly, Sapper excluded such sums from petitioners' income in 1963. In about 1961, an estate tax audit was commenced in respect of Lester Martin's estate. The existence of a controversy between Sylvia Martin and petitioners was known to respondent from the outset of such audit. Moreover, after execution of the 1963 settlement, which had been approved *221 by surrogate's court, the Attorney General of the State of New York, [13] and independent counsel for the foundation, respondent was given a copy of the same as well as copies of gift tax returns filed to reflect the gifts therein.
Jane's action to impress an oral trust upon Sylvia's legacy was withdrawn in accordance with the settlement agreement. Robert's similar action, which was not even filed until November, 1962 was not withdrawn until 1964. Robert received nothing in return for such withdrawal of suit; however, it appears that other circumstances attended his surrender of the action. [14]
On October 8, 1971 respondent issued to petitioners a statutory notice of deficiency in which he determined that Jane Ginsburg had $415,750.14 of executrix commission income for 1963 *222 that was fraudulently omitted from petitioners' 1963 return. In 1963 and 1964 Arnold claimed the following farm loss deductions: 1963
1964
Interest
$ 1,500
$ 6,000
Maintenance
10,000
21,200
Depreciation
11,250
22,500
Total Expenses
$22,750
$49,700
Less income from
culled calves
(0)
(9,800)
Farm Loss
$22,750
$39,900 These deductions were attributable to Arnold's investment in a cattle breeding program at Briarcliff Farms, Inc. (Briarcliff). Arnold's participation in the Briarcliff program was at the suggestion of Arnold's tax accountant, Saul Sapper. The nature of Arnold's investment in the breeding program is outlined in the Briarcliff prospectus. Arnold, as a breeder-investor, bought 125 brood cows at a cost of $1,000 each. Arnold paid $25,000 and financed the balance with a $100,000 mortgage. He had no personal liability on the mortgage. The program provided for a guaranteed repurchase of the herd by Briarcliff at specified prices, thus limiting the investors' risks. The herd would be tended and bred at Briarcliff at an annual maintenance fee to the breeder-investor of $160.00 per head. Based upon the schedule attached to the *223 prospectus, calculated with reference to guaranteed returns and without reference to mortgage financing, an investor could expect to be in the following cash position after participating in a five-year breeding program: Breeder's cash outlay
Original investment
$125,000
Maintenance fees over
5-year period
115,200
Total
$240,200
Breeder's expected value of investment
after 5 years
Calves sold during 5-year period
$ 49,200
Receipts for brood cows removed
from herd during 5-year period
5,000
Salvage value of brood cows from
original herd remaining at the
end of 5-year period ( $100 per
head x 100 cows) [15]
10,000
Guaranteed sales proceeds from
offspring of original herd
remaining at the end of 5-year
period
$150,500
Total
$214,700 [16]
The Briarcliff prospectus sets forth on its first page the tax incentives for cattle breeding investments: In order to encourage investment *224 in cattle breeding and thus insure a continued supply of beef, one of this country's basic foods, the Bureau of Internal Revenue has granted special concessions.These are: 1. Depreciation -- Purchase cost of the breeding herd may be depreciated over an 8 year estimated useful life and taken as a deduction against ordinary income. 2. Sales proceeds -- amounts received on sales of the breeding herd are taxed as capital gains with 25% tax rate limitation. Amounts realized on sales of calves not retained as part of the breeding herd are taxed as ordinary income. 3. Herd development costs -- amounts paid to feed, raise and maintain the breeding herd including all operating, administrative and financial expenses are deductible from ordinary income. Additional tax advantages in the way of interest deductions were listed as available to the breeder-investor who financed a large portion of the $125,000 original investment with a mortgage. Moreover, the following paragraph appears at the foot of an exhibit attached to the prospectus: The participation of the breeder-investor is primarily concerned with intensive highly selective breed improvement; however, it is a flexible one *225 which may be varied to meet each individual's management ideas and financial needs. His program can be increased, decreased or discontinued on an annual basis and can be adjusted to fit his own needs for both capital gain and ordinary income. Respondent disallowed the claimed farm losses in their entireties in his statutory notices of deficiency. Respondent has since conceded that those portions of the claimed losses attributable to interest expenses were properly claimed. OPINION Taxable Year 1963
Since the notice of deficiency for the year 1963 was not issued until October 8, 1971, any assessment for that year is barred by the statute of limitations unless the respondent can show that petitioners filed a false or fraudulent return with the intent to evade tax. Section 6501(c). In the usual situation, the taxpayer has the burden of proof as to respondent's determination of a deficiency while the respondent has the burden of proof as to the existence of fraud, a burden which he must satisfy by clear and convincing evidence. Section 7454; Rule 142(a) and (b), Tax Court Rules *226 of Practice and Procedure; Kathleen C. Vannaman,54 T.C. 1011, 1017 (1970); Jacob D. Farber,43 T.C. 407, 419 (1965), affirmed in a supplemental opinion 44 T.C. 408 (1965); Luerana Pigman,31 T.C. 356, 370 (1958). Here the allegation of fraud is inextricably related to the allegation of omission of income -- some $415,000 of purported executors' commissions claimed by respondent to have been paid through the discharge and satisfaction of purported indebtedness of Jane. In this context, we are required to exercise care so that we do not allow the conclusion that petitioners have failed to carry their burden of proof as to the underlying deficiency -- or, the flip side of that burden of proof, namely the so-called presumptive correctness of respondent's determination of an omission of income -- to furnish the exclusive foundation for the conclusion that respondent has carried his burden of proof as to fraud. Driebourg v. Commissioner,225 F. 2d 216, 218 (6th Cir. 1955), affirming in part a Memorandum Opinion of this Court; C. A. Reis,1 T.C. 9, 13 (1942); Peter Mazzoni,T.C. Memo. 1970-37, *227 affd. sub nom. Estate of Mazzoni v. Commissioner,451 F.2d 197 (3rd Cir. 1971); Grant Foster,T.C. Memo. 1965-246, affd. as to the fraud issue 391 F. 2d 727 (4th Cir. 1968).To do otherwise would cause us to run afoul of the mandates that fraud will not be imputed or presumed and that mere suspicion of fraud is insufficient. E.g. Carter v. Campbell,264 F. 2d 930, 935 (C.A. 5, 1959). Having thus established the legal parameters of our task, we turn first to the question whether petitioners omitted income from their 1963 return. We have set forth in our findings a detailed description of the underlying facts and we see no purpose to be served by repeating them. It is sufficient to say that there were so many elements involved in the negotiations leading up to the 1963 settlement and in the settlement itself -- e.g., the assertion by Jane of an oral trust on Sylvia's share of Lester's estate, [17] control of Bates and Windsor and the attendant difficulties of dealing with Sylvia, the juxtaposition of Sylvia's as against *228 Jane's right to executrix commissions on the one hand and Arnold's, as against Jonah Goldstein's right to such commissions on the other, and the handling of Jane's affairs by Lester -- that, if only the underlying deficiency were at issue, we could at most conclude that petitioners had failed to carry their burden of proof that there was not a payment of Jane's indebtedness in lieu of commissions to which she would have otherwise been entitled. But even if we were to conclude that there was a sufficient matching of the payment of Jane's indebtedness with her waiver of such commissions [18] so as to constitute an amount of omitted income, we would not be able to conclude that respondent had carried his burden of proof as to the existence of fraud. In so stating, we recognize that direct proof of fraud is seldom possible and that a finding of fraud can be based on the taxpayers' conduct in *229 relation to the underlying transactions. See Leon Papineau,28 T.C. 54, 57-58 (1957). We also recognize that the addition to tax for fraud attaches even though only part of a deficiency is due to fraud. Section 6653(b); Arlette Coat Co.,14 T.C. 751 (1950). At the same time, it is clear that the existence of an omission from income with a resultant deficiency is not in and of itself sufficient to constitute fraud. See Merritt v. Commissioner,301 F. 2d 484, 487 (5th Cir. 1962), affirming T.C. Memo. 1959-172. To a large degree, our lack of conviction as to the existence of fraud is based upon the same findings which led us to conclude that the most that could be said as to the underlying deficiency was that petitioners had failed to carry their burden of proof. *230 To these ingredients, we would add the omnipresent role of lawyers and accountants for all the parties involved. Neither Arnold's personal involvement in the litigious state of affairs which preceded the 1963 settlement nor his "tax" sensitivity is sufficient to convince us that he and Jane did not rely upon their expertise and advice in determining the tax implications of the settlement. See Marko Durovic,54 T.C. 1364, 1398 (1970), modified on other grounds, 487 F.2d 36 (7th Cir. 1973).At most these elements, as well as the conflicting nature of some of the evidence, [19] create an aura of suspicion as to petitioners' realization of the tax consequences of the actions taken but this is simply not enough. John Marinzulich,31 T.C. 487, 493 (1958); L. Glenn Switzer,20 T.C. 759, 765 (1953). The long and the short of the instant case is that the record herein falls short of the clear and convincing evidence necessary to sustain respondent's contention that petitioners devised a scheme whereby Jane would receive an executrix commission from Lester's estate disguised in the form of nontaxable gifts and that their purpose *231 in so doing was the evasion of tax with the result that they should be subjected to the addition to tax for fraud within the meaning of section 6653(b). On the basis of the entire record before us and our evaluation of the demeanor and manner of the witnesses whose testimony we heard, we hold that respondent has failed to carry his burden of proof and that therefore the taxable year 1963 is barred by the statute of limitations. Section 6501(c). Taxable Year 1964
Respondent takes the position that, except to the extent of interest paid on Arnold's mortgage of cattle purchased, the claimed farm loss is not deductible since Arnold's purpose in entering into the Briarcliff cattle breeding program was not to make *232 a profit (see section 165(c)(2); see also Income Tax Regs. sec. 1.165-6) but rather to shelter some of petitioners' nonfarm income from tax. The mere fact that Arnold may have had a strong tax avoidance purpose in entering into the cattle breeding program is not determinative provided he also had the motive of deriving an economic profit aside from the tax benefits. Knetsch v. United States,348 F. 2d 932, 936-937 (Ct. Cl. 1965). As we have stated on another occasion: "The building may not be constructed entirely from the tax advantage, but, if the foundation and bricks have economic substance, the economic or financial inducement of the tax advantage can provide the mortar." See W. Lee McLane, Jr.,46 T.C. 140, 145 (1966), affd. per curiam 377 F. 2d 557 (9th Cir. 1967). See also E. Keith Owens,64 T.C. 1, 14 (1975), on appeal (6th Cir., December 10, 1975); Max Starr,46 T.C. 450, 460 (1966). In the same vein, a taxpayer's profit motive need not be reasonable so long as it is *233 bona fide. See Margit Sigray Bessenyey,45 T.C. 261, 275 (1965), affd. 379 F. 2d 252 (2d Cir. 1967). The single question before us is whether Arnold had the requisite profit motive. This is a question of fact (see Margit Sigray Bessenyey,supra) and petitioners have the burden of proof. Rule 142, Tax Court Rules of Practice and Procedure.
Arnold testified that he participated in the Briarcliff program on the advice of his tax accountant and that he believed he was going to make a profit. The accountant testified that he gave such advice for three reasons: (1) the potentiality of "big profits" if the price of cattle rose, (2) the limited risk involved because of Briarcliff's guaranteed cattle repurchase plan, and (3) tax savings. However, neither Arnold nor his accountant has shown he had any knowledge of cattle breeding as an investment apart from that which was gleaned from the Briarcliff prospectus. [20]
That Arnold and the accountant testified without contradiction by other testimony does not require us to accept their testimony *234 as gospel, particularly where, as is the case here, the issue is one of subjective intent; we are free to analyze all the surrounding circumstances and draw reasonable inferences therefrom. Fleischer v. Commissioner,403 F. 2d 403, 406 (2d Cir. 1968); Albert L. Dougherty,60 T.C. 917, 932 (1973). The prospectus shows that what a breeder-investor would be left with after participating in the five year program would be noticeably less than the value of his original investment. [21] The inference to be drawn therefrom is that any gain to be realized would be in the form of net tax savings which would exceed investment loss. Page 1 of the prospectus lays out the tax incentives for cattle breeding and any reference thereafter to "profit" must be read in relation thereto. The fact that Arnold was not personally liable on the mortgage does not impair our analysis. Such absence of liability merely minimizes the potential for loss; it does not evidence any ingredient of profit. It therefore appears that Arnold's expectation at the time of making the Briarcliff *235 investment was that his tax savings from interest, maintenance, and breeding expense deductions over the course of the program would be in excess of the shrinkage of his investment, [22] consisting of the purchase price and annual expenses, as well as any tax liability on the disposition of the cattle. Cf. Edward Jasionowski,66 T.C. 312 (1976). We express no opinion as to whether we would have reached the same conclusion if we had had the benefit of other evidence from which we might have inferred or deduced that Arnold acted in the hope or with expectation that the price of cattle would increase to the point of turning his investment into a "profitable" one. See Brown v. United States,396 F. 2d 459, 466 (Ct. Cl. 1968). The farm loss deduction claimed for 1964 is disallowed except to the extent of the conceded interest. *236 Decision will be entered under Rule 155 in Docket No. 4741-69.
Decision will be entered for the petitioners in Docket No. 184-72. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.↩
2. The record does not indicate where petitioners' 1964 return was filed.↩
3. By this will, Lester revoked a prior testamentary instrument in which his estate was to be somewhat similarly distributed. However, the earlier will named the children as beneficiaries of Sylvia's share in the event that she predeceased Lester. In addition, the earlier document named one William Gellin and Sylvia as executors; in the event that Sylvia predeceased the testator, Jane was to be co-executrix. The will specifically provided that Sylvia and Jane were to serve without compensation. Lester's Last Will and Testament was drafted by Jonah Goldstein to serve as Lester's dispositive plan until a more definitive instrument was drafted by another attorney. This more definitive document was not prepared prior to Lester's passing. The function of the "interim will", which eventually served as the Last Will and Testament, was to remove William Gellin as an executor. ↩
4. Because a small amount of Lester's property passed outside of his will (via life insurance and jointly-held property), a perfect division of the estate was not achieved.↩
5. In connection with the administration of the estate, some 14 proceedings, 34 motions, and 5 separate actions were instituted.↩
6. Some of the Windsor stock in the estate was held by Lester directly, the balance was held by two of Lester's controlled corporations which were essentially holding companies, the stock of which was part of Lester's estate. ↩
7. It is clear that petitioners had control of the management of the foundation at this time and that the foundation's potential control of Windsor would be jeopardized if the estate's shares therein were distributed to Sylvia.↩
8. Arnold had a seat on the American Stock Exchange. Between 1958 and 1959, Arnold was a director of Mojud Corporation, a company in Lester Martin's control. From 1956 to 1958, Arnold worked in New York for Oppenheimer & Co. And, from his college graduation in 1950 until 1956, Arnold was involved in the management of his own family's appreciable business holdings in Boston and served as an executor of his father's sizable estate.↩
9. Petitioners feared that, notwithstanding the great amount of time and effort Arnold devoted to estate matters, if Sylvia pursued and succeeded in her action to remove her three co-executors, Arnold would not receive his commission.↩
10. Lester had singular control of Jane's assets during his lifetime.Jane only knew what Lester told her and gave her signature freely at his request. Until the death of her father, Jane and Arnold filed separate income tax returns and Jane's return was prepared under her father's direction.↩
11. The circumstances attending the inclusion of Jane's "obligations" to the estate in the return are clouded, at best. Apparently, counsel preparing the return contacted the attorney for one of Lester's enterprises and, subsequently, for Arnold Ginsburg, about the nature of these items on Lester's books. The attorney told the return preparer that he didn't know what these items were, but if they were receivables, they were probably non-interest bearing obligations.With only this information, the $37,000 note and the $70,000 loan receivable were included in the return as estate assets at face value. ↩
12. See pp. 5-6, supra↩. Petitioners also failed to notify the estate tax return preparer of these transactions when he requested information about Lester Martin's intervivos gratuitous transfers. This request, however, came at the time petitioners and Sylvia Martin began having serious difficulty in agreeing on estate matters (December, 1960) and each executor found it necessary to retain separate counsel.
13. The stipulation of the parties recites that the United States Attorney for the Eastern District of New York appeared in the surrogate court proceeding and did not oppose the settlement but is silent as to the reasons for his involvement.↩
14. Apparently, at some point prior to his withdrawal of suit against Sylvia, Robert was arrested at Sylvia's request for forging one of her dividend checks.↩
15. Briarcliff's guaranteed repurchase price of cattle in this category was only $1.00 per head. ↩
16. The prospectus also contained an actual projected economic picture of the five-year program but the difference in the two sets of projected figures is not significant.↩
17. We cannot say that such assertion was so lacking in merit as to constitute a sham claim. Cf. Oursler v. Armstrong,10 N. Y. 2d 385, 179 N.E. 2d 489, 223 N.Y.S. 2d 477↩ (1961).
18. It seems clear that there was an indebtedness of Jane at least to the extent of $145,750.14 borrowed from the Kings County Bank & Trust Company after Lester's death.↩
19. We recognize that petitions for Jane to receive advance commissions were filed and that both she and Arnold at one time or another stated that no such petitions were filed or that they could not remember whether they were filed. Standing against any unfavorable inferences to be drawn from the foregoing is the testimony of Jane's attorney that such petitions were intended to spur stalemated negotiations and the fact that Jane's petitions were not pursued.↩
20. Arnold simply testified that he made a personal inspection of the Briarcliff Farm facilities.↩
21. See p. 20, supra.↩ The loss anticipated by the prospectus would be even greater where a large mortgage is used to finance program participation and substantial interest charges are incurred. 22. We note the degree of shrinkage was more or less determinable because of Briarcliff's guaranteed repurchase plan.↩